IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANGELE L. CHANG-WILLIAMS

    v.             :      Civil Action No. DKC 10-0783

DEPARTMENT OF THE NAVY, et al.

**MEMORANDUM OPINION**

Presently pending in this case brought pursuant to the Federal Tort Claims Act ("FTCA") are the Government's motion to dismiss or alternatively for summary judgment (ECF No. 10), as well as motions for leave to supplement filed by Defendant United States (ECF No. 14) and Plaintiff Angele Chang-Williams (ECF No. 15). The issues are fully briefed and the court now rules, no hearing being deemed necessary. *See* Local Rule 105.6. For the reasons that follow, the Government's motion, which will be construed as a motion for summary judgment, will be granted in part and denied in part. In addition, both motions to supplement will be granted.[1]

---

[1] After the parties finished briefing on the motion for summary judgment, the United States moved to supplement with the declaration of Marine Corps Major James J. Richards. (ECF No. 14). The Government had trouble getting Richards' declaration because he is stationed in Okinawa, Japan and Chang-Williams misidentified him as "Captain Richardson." (*Id.*). Chang-Williams opposed, but asked for leave to submit her own supplemental declarations in the event that Richards'

As a threshold matter, the proper defendant in this FTCA action is the United States. The other three defendants named in Chang-Williams' complaint – the Department of the Navy, "JAG," and the Marine Corps – must be dismissed from this case. The FTCA expressly provides that federal agencies are not amenable to suit under its provisions. 28 U.S.C. § 2679(a); *see also Holmes v. Eddy*, 341 F.2d 477, 480 (4th Cir. 1965). The Act provides for liability against only "[t]he United States," 28 U.S.C. § 2674, and plaintiffs seeking relief under the Act may pursue it against that defendant alone, *Strong v. Dyar*, 573 F.Supp.2d 880, 884-85 (D.Md. 2008).

## I.   Background

### A.   Factual Background

The facts of this case are tragic. Just before midnight on November 12, 2002, Chang-Williams and her family were attacked at their home by U.S. Marine Corps Sergeant Estabon Eugene, the estranged husband of Chang-Williams' niece. Eugene, who was searching for his wife, shot and killed Chang-Williams' husband, Kelvin Chang, and her son, Aldwin Chang. Chang-Williams was

---

declaration was admitted. (ECF No. 15). No apparent prejudice would result from allowing both parties to supplement and the United States has provided good cause for its delay. Therefore, both motions to supplement will be granted.

herself shot in the face, but survived. She now seeks damages from the United States for certain acts related to the attack.

The following facts are uncontroverted.

Nakeisha Rhea, Chang-Williams' niece, married Eugene in June 2002. (ECF No. 10-3, at 2).[2] According to Chang-Williams, something was "not right about" Eugene from the very beginning, and at times he displayed an "unstable" and "violent" temper. (*Id.* at 2). On multiple occasions, Eugene threatened Rhea. (*Id.* at 4). Eugene's violent temperament led Rhea to seek refuge at Chang-Williams' home "on several occasions." (*Id.* at 4).

On November 1, 2002, Eugene's temper again boiled over. Prince George's County police arrived at Eugene and Rhea's home in Landover to find Rhea badly beaten,[3] with blood covering the walls and floors. (ECF No. 10-2, at 2). When police reached the scene, Eugene fled; Prince George's County police later

---

[2] Citations to the relevant exhibits are cited as "ECF No., at page number." The indicated page number is the number included in the ECF header, rather than any internal pagination found in the cited document.

[3] Exhibits eight and nine to the complaint depict Rhea's injuries, which include extensive swelling and bruising. (ECF Nos. 1-8, 1-9). Members of the military allegedly took the photographs. (ECF No. 10-3, at 5, 9).

3

apprehended him after he crashed his car elsewhere in Landover. (*Id.*).

Authorities arrested and charged Eugene with assault in the second degree and refusal to follow a lawful police order. (*Id.* at 1). Although he was initially confined to the Prince George's County Detention Center, Eugene was released on bail on November 2. (ECF No. 10-4, at 1). Marine Corps Master Sergeant Bruce Witherspoon acted as Eugene's indemnitor and paid the $510 bail bondsman's fee. (*Id.* at 4).

After his release, Marine Corps command ordered Eugene to undergo psychiatric screening. (ECF No. 10-5, at 1). Consequently, from November 4 through November 12, Eugene met occasionally with counselor and Marine Corps Master Sergeant John Charles. (*Id.*). Records indicate that Eugene acted inconsistently during these sessions. On the one hand, he denied having "homicidal or suicidal intent" and expressed a willingness to change. (*Id.* at 1-4). On the other hand, Charles noted that Eugene's "thought processes . . . did not appear logical, as he seemed to be focusing more on why his spouse thought and acted in a certain manner rather than on obviously wanting to take responsibility for his previous actions." (*Id.* at 1). Eugene also told Charles that he felt "extremely upset because of threats by various members of his

4

wife's family" and believed that there was "no light at the end of the tunnel." (*Id.* at 2, 3).[4] Just eight hours before Eugene attacked Chang-Williams and her family, Charles briefly talked with Eugene, who "appeared to be doing fine." (*Id.* at 4).

On November 5, 2002, four days after Eugene's initial arrest, Marine Corps command issued a "Military Protection Order." (*Id.*). The order instructed Eugene to stay at least 100 feet away from Rhea, her residence, or her work place, and barred him from having any unauthorized contact with her. (*Id.* at 1). The military order was to remain in effect for one month. (*Id.* at 2).

The next day, Rhea petitioned the District Court of Maryland for Prince George's County for a protective order. (ECF No. 10-8). Rhea sought protection for herself and several family members, including Chang-Williams. (*Id.* at 5). The court entered a temporary protective order on November 6, which forbade Eugene from contacting Rhea and instructed him to "stay away" from several temporary residences, including Chang-Williams' residence in Capitol Heights, Maryland. (ECF No. 10-9). The state order was in force until November 13. (*Id.*).

---

[4]    Eugene also met with Marine Corps Major Stephen Crow. (ECF No. 10-6). During that meeting, Eugene again denied any suicidal or violent intent, but admitted that "the situation had made him distraught." (*Id.* at 1).

On November 7, 2002, Eugene rented a car in Virginia. (ECF No. 10-10). He also purchased a 9mm Ruger handgun. A few days later, on November 12, Eugene drove the rental car to Chang-Williams' house in Capitol Heights and hid outside. (ECF Nos. 10-3, at 12; 10-11, at 2). When Chang-Williams' son Aldwin returned home, Eugene revealed himself, brandished the pistol, and forced his way into the house. (ECF Nos. 10-3, at 12; 10-11, at 2). Aldwin escaped to a neighbor's house to call the police, but Eugene found Chang-Williams sitting in the front room of the home. (ECF Nos. 10-3, at 12; 10-11, at 2). He threatened her with the pistol and demanded to know where Rhea was; Chang-Williams told him Rhea was not there. (ECF No. 10-3, at 12). In response, Eugene shot Chang-Williams in her face and hand, leaving her bleeding and unconscious on the floor. (ECF No. 10-3, at 12-13). Eugene then went upstairs, where he found Chang-Williams' husband Kelvin asleep in his bed. (*Id.* at 12). Eugene shot and killed him. (*Id.*) Hearing the shots, Aldwin ran back towards the house from the neighbor's home. (ECF Nos. 10-3, at 13; 10-11, at 2). When Aldwin encountered Eugene in the driveway, Eugene killed him, too. (*Id.*).

Eugene left Chang-Williams' house and drove to the home of another of Rhea's family members, Ursula Charley, in Mitchellville. (ECF No. 10-11, at 2). Once there, he attempted

to break into the house, but fled the scene when the residents inside started screaming. (*Id.*). Police eventually spotted Eugene in his rental car and a chase ensued. (*Id.*). The chase ended when Eugene crashed his car on the Capital Beltway and then turned the gun on himself. (*Id.*). Eugene died on November 15. (*Id.*).

The parties' accounts differ on one important fact: the parties dispute whether the Marine Corps offered any specific assurances of protection before the shooting to Rhea's family, including Chang-Williams, her husband, and her son.

According to Chang-Williams, Captain James Richards and "Gunnery Sergeant Holden" visited Charley's home on November 4. (ECF Nos. 12-3, at 1; 15-2, at 2). Nakeisha Rhea, Carolyn Rhea, and Shelita Simmons were present. (ECF No. 12-3, at 1). Nakeisha told the Marines about the incident on November 1 and told them she was afraid her husband would return for her. The family members also told the Marines that they were afraid Eugene would look for Nakeisha at Chang-Williams' home,[5] and that Chang-Williams' home was in fact "the place Sergeant Eugene would go to first." (*Id.*). They further expressed fears that Eugene would hurt them. (*Id.*). The two Marines, however,

_____

[5] Both Kelvin and Aldwin lived with Chang-Williams at the home in Capitol Heights. (ECF No. 10-3 ¶ 5).

assured the family that they would protect "all of [them]." (ECF No. 12-3, at 2; *see also* ECF No. 15-2, at 2). In particular, the family was told that Eugene would not be allowed to return to his house, would be confined to the base, and would not be free to leave the base without an escort. (ECF Nos. 12-3, at 2; 12-2, at 1; 15-1, at 2). Chang-Williams learned of the promise through Charley. (ECF No. 12-3, at 3).

The Government submits a declaration from Richards. (ECF No. 14-1). In the declaration, Richards recalls that he and a Marine Master Sergeant visited Nakeisha at the home where she was staying. (*Id.* at 2). He does not remember the entire visit. (*Id.*). Nor does "recall guaranteeing the safety of the victim's family members." (*Id.*). He remembers that Eugene was placed on "restriction by command," but not any "24/7" suicide watch. (*Id.*). He also states that he "did not place any Marines outside any dwellings." (*Id.*).

**B.   Procedural Background**

Chang-Williams and her two daughters, DeLisia Carpenter and Vinele Chang, filed an administrative claim for wrongful death and injury with the Naval Legal Service Office on November 12, 2004 for just under $2.7 million. (ECF No. 10-12). The "shootings and murders committed by Marine Corps Sgt. Est[a]bon Eugene" formed the basis of the claims. (*Id.* at 1). Almost

8

five years later, on September 29, 2009, the Department of the Navy denied the claims in their entirety.  (ECF No. 10-13, at 1).  The denial letter stated three bases:  (1) the waiver of sovereign immunity found in the FTCA "excludes any claim arising out of assault and battery, including homicide"; (2) Eugene was not acting within the scope of his employment during the relevant events; and (3) federal officials had no duty to protect Chang-Williams' family and could not have foreseen the murders.  (*Id.* at 1-2).

On March 30, 2010, Chang-Williams filed a *pro se* complaint in this court seeking damages of $6 million.  (ECF No. 1).  The complaint asserts claims for wrongful death, "malicious act," and personal injury against four defendants:  the Department of the Navy, "JAG," the U.S. Marine Corps, and the United States.  (*Id.* at 1).  Giving the complaint liberal construction, as the court must,[6] it could be read to assert (1) claims related to Chang-Williams' personal injuries premised on negligent failure to protect, negligent supervision, and *respondeat superior* liability; and (2) claims for the wrongful deaths of Kelvin and Aldwin based on the same theories.  On August 11, 2010, the

---

[6]  "[P]ro se complaints, however unskillfully pleaded, must be liberally construed."  *Noble v. Barnett*, 24 F.3d 582, 587 n.6 (4th Cir. 1994).

United States moved to dismiss or, alternatively, for summary judgment. (ECF No. 10). Pursuant to the requirements of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the court notified Chang-Williams that the Government had filed a dispositive motion, the granting of which could result in the dismissal of her complaint. (ECF No. 11). The court also informed Chang-Williams that she was entitled to file materials in opposition within 17 days from the date of that letter and that her case could be dismissed if she did not establish a genuine dispute of material fact. (*Id.*). Chang-Williams filed her opposition on August 27, 2010. (ECF No. 12).

## II. Standard of Review

The Government has moved to dismiss or, alternatively, for summary judgment. Because both parties rely on matters outside the pleadings, the court will treat the motion as a motion for summary judgment. *See Walker v. True*, 399 F.3d 315, 319 n.2 (4th Cir. 2005); *accord Offen v. Brenner*, 553 F.Supp.2d 565, 568 (D.Md. 2008).

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary

judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

## III. Analysis

### A. The Federal Tort Claims Act

Chang-Williams brings her claims pursuant to the FTCA. The United States, as a sovereign, is immune from suit unless it

consents to suit via an explicit waiver. *United States v. Sherwood*, 312 U.S. 584, 587 (1941). The FTCA is one such waiver, which "mak[es] the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813 (1976); *see* 28 U.S.C. §§ 2671-80. Although the FTCA provides tort claimants with one potential avenue for relief, the path to relief is a narrow one, which provides for liability "only on terms and conditions strictly prescribed by Congress." *Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 741 (4th Cir. 1990). Moreover, the wavier itself is "subject to several exceptions." *Suter v. United States*, 441 F.3d 306, 310 (4th Cir. 2006).

"[T]o establish subject matter jurisdiction, an FTCA plaintiff bears the burden of establishing . . . that the Government employee was acting within the scope of his or her employment at the time of the accident." *Kerns v. United States*, 585 F.3d 187, 194 (4th Cir. 2009). In addition, the "specific exceptions outlined in the Act . . . [are] considered jurisdictional." *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005). Hence, these issues are addressed first because "[w]ithout jurisdiction the court cannot proceed at all in any

cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

**1. Scope of Employment**

The FTCA provides the court with jurisdiction only when the government employee in question is "acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). In Maryland,[7]

> [t]he simple test is . . . not whether [the relevant acts] were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him. By 'authorized' is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders.

*Larsen v. Chinwuba*, 377 Md. 92, 105-06 (2003) (quoting *Sawyer v. Humphries*, 322 Md. 247, 255 (1991)).

The Government correctly contends that Eugene's activities were not within the scope of his employment. The complaint briefly references Eugene's status as an "active duty member" of the Marine Corps (ECF No. 1, at 1), but provides no further hint that his attack on Chang-Williams' family fell within the scope

_____

[7] Federal courts look to the "law of the state in which the tort occurred" to decide the scope of employment issue. *Maron v. United States*, 126 F.3d 317, 324 (4th Cir. 1997).

13

of his employment. The present record also does not suggest that Eugene's off base, off-duty acts were incident to the performance of his duties as a Marine or that they in any way advanced the Marine Corps' purposes. Because Eugene's acts were outside the scope of his employment, they are beyond the reach of the FTCA's sovereign immunity waiver. Consequently, any allegation that the United States is directly liable for Eugene's acts based on a theory of *respondeat superior* must be dismissed.[8]

The Government does not argue, however, that the alleged acts of other government agents were outside the scope of their employment. To the contrary, when agents of the Marine Corps allegedly promised to protect Chang-Williams (and her family) and then failed to so, those actions could be seen as "incident to the performance" of their ordinary duties. (*See, e.g.*, ECF No. 14-1, at 1-2 ("Since it was a Marine from the Defense Message System (DMS) section, . . .I . . ., along with a MSgt who also worked in the DMS section, went to check on the victim where she was staying.")). It follows that the actions of those Marines would be within the scope of their employment.

---

[8]    It is not entirely clear from the complaint whether Chang-Williams advances any such claim. Her opposition to the Government's motion does not discuss it. Nevertheless, the matter is addressed out of an abundance of caution.

### 2. The Intentional Tort Exception

The United States also argues that the intentional tort exception to the FTCA bars Chang-Williams' claims. Specifically, the Government maintains that "all of Plaintiff's claims against the United States should be dismissed because they all depend upon the existence of the ultimate assault and battery committed by Eugene," and as such are barred by the intentional tort exception found in 28 U.S.C. § 2680(h). (ECF No. 10-1, at 17 n.6 (citing *Perkins v. United States*, 55 F.3d 910, 916-917 (4th Cir. 1995))).

The intentional tort exception provides that the United States retains immunity as to "[a]ny claim arising out of [an] assault [or] battery." 28 U.S.C. § 2680(h). Indisputably, Eugene's murderous acts constituted assault and battery. That assault could not form the basis for a direct claim against the United States. *See, e.g.*, *Stepp v. United States*, 207 F.2d 909, 911 (4th Cir. 1953) (concluding Section 2680(h) barred *respondeat superior* claim where servicemember used excessive force in shooting civilian); *Wise v. United States*, 8 F.Supp.2d 535, 542 (E.D.Va. 1998) (holding Section 2680(h) barred direct liability claim premised on servicemembers' sexual assault and murder of civilian). In other words, the intentional tort exception would

provide an additional basis for dismissing any *respondeat superior* claim based on Eugene's actions.

But Chang-Williams does not advance solely a direct claim against the Government. Rather, she makes certain negligence claims that, while related to Eugene's actions, stem from the independent and allegedly negligent actions of other government agents. The Government nevertheless protests that her claims amount to nothing more than a negligent supervision claim. Such claims, it says, must be barred by the intentional tort exception.

The analysis begins with the plurality decision in *United States v. Shearer*, 473 U.S. 52 (1985). Vernon Shearer was a private in the U.S. Army. *Id.* at 53. While off duty and away from his base, Private Andrew Heard kidnapped and murdered him. *Id.* Shearer's mother then attempted to sue the United States under the FTCA for the Army's negligence in failing to "exert a reasonably sufficient control over" Heard and failing to "warn other persons" of Heard's criminal history. *Id.* at 54. Four justices of the Supreme Court concluded it was "clear" that the claims arose "out of the battery committed by Private Heard." *Id.* at 54-55. The plurality read the intentional tort exception broadly, construing it as a bar to virtually any negligence claim associated with an assault or battery:

> No semantical recasting of events can alter
> the fact that the battery was the immediate
> cause of Private Shearer's death and,
> consequently, the basis of respondent's
> claim.
>
> Respondent cannot avoid the reach of
> § 2680(h) by framing her complaint in terms
> of negligent failure to prevent the assault
> and battery. Section 2680(h) does not
> merely bar claims for assault or battery; in
> sweeping language it excludes any claim
> arising out of assault or battery. We read
> this provision to cover claims like
> respondent's that sound in negligence but
> stem from a battery committed by a
> Government employee.

*Id.* at 55. Near the end of its opinion, the plurality appeared to foreclose negligence claims such as Chang-Williams', concluding: "[I]t is inescapable that the phrase 'arising out of assault [or] battery' is broad enough to encompass claims sounding in negligence." *Id.* at 56.

Just three years later, in *Sheridan v. United States*, 487 U.S. 392 (1988), the Court retreated from the position advanced by the plurality in *Shearer*. In *Sheridan*, the plaintiff alleged that the United States negligently failed to prevent Carr, a drunken off-duty serviceman, from shooting him. *Id.* at 393-94. Just before the shooting, three naval corpsman had encountered the obviously intoxicated Carr with a rifle, but the corpsman fled the scene rather than taking Carr to an emergency room. *Id.* at 395. On these facts, a majority of the United States

17

Court of Appeals for the Fourth Circuit concluded that the intentional tort exception applied and barred any relief premised on negligence. *Id.* at 395-97. Chief Judge Winter dissented, stressing that there was a distinction between negligence actions premised solely on the employment relationship and those premised on the breach of a duty independent of the employment relationship:

> [C]ases where the purported government negligence was premised solely on claims of negligent hiring and/or supervision. . . . are essentially grounded in the doctrine of respondeat superior. In these cases, the government's liability arises, if at all, only because of the employment relationship. If the assailant were not a federal employee, there would be no independent basis for a suit against the government. It is in this situation that an allegation of government negligence can legitimately be seen as an effort to 'circumvent' the § 2680(h) bar; it is just this situation – where government liability is possible only because of the fortuity that the assailant happens to receive federal paychecks – that § 2680(h) was designed to preclude.
>
> On the other hand, where government liability is independent of the assailant's employment status, it is possible to discern two distinct torts: the intentional tort (assault and battery) and the government negligence that precipitated it. Where no reliance is placed on negligent supervision or respondeat superior principles, the cause of action against the government cannot really be said to 'arise out of' the assault and battery; rather it is based on the government's breach of a separate legal duty.

*Id.* at 397-98 (quoting *Sheridan v. United States*, 823 F.2d 820, 824 (4th Cir. 1987)).

On review, the Supreme Court first recognized that "[t]he words 'any claim arising out of' an assault or battery are unquestionably broad enough to bar all claims based *entirely* on an assault or battery." *Sheridan*, 487 U.S. at 398. Nevertheless, the Court also considered it "settled" that in "at least some situations the fact that an injury was directly caused by an assault or battery will not preclude liability against the Government for negligently allowing the assault to occur." *Id.*

In some ways tracing Judge Winter's analysis, the Court posited two theories that might help draw the line between cognizable and non-cognizable negligence claims implicating an intentional tort. *Id.* at 399-400. Under the first theory, one might assume that the independent negligent act of the government official is the predominant act, such that the claim does not truly "arise out of" the intentional tort. *Id.* at 399. Under this approach, "the intentional commission is simply considered as part of the causal link leading to the injury." *Id.* Put differently, a claim would be viable under this theory when the actual assault "serves only to establish the extent of the plaintiff's injury, not to establish the . . . breach of

duty."  *Thigpen v. United States*, 800 F.2d 393, 399 n.10 (4th

Cir. 1986) (Murnaghan, J., concurring).

Instead of fully endorsing this first approach, *Sheridan*

instead relies on a second theory: "the intentional tort

exception is simply inapplicable to torts that fall outside the

scope of [Section] 1346(b)'s general waiver."  *Sheridan*, 487

U.S. at 400.  Because Carr's acts were not within the scope of

his employment, those acts – standing alone - would not have

given rise to government liability under the FTCA; as such, the

intentional tort exception did not apply.  *Id.* at 400-401.  The

negligence of other government employees provided an "entirely

independent" basis for liability unshielded by Section 2680(h),

as they voluntarily assumed a responsibility to perform their

"'Good Samaritan task' in a careful manner."  *Id.* at 401

(quotation marks and citations omitted).  Assuming that the

government employees had such a "Good Samaritan" duty under

state law, the Court concluded:

> [I]t seems perfectly clear that the mere
> fact that Carr happened to be an off-duty
> federal employee should not provide a basis
> for protecting the Government from liability
> that would attach if Carr had been an
> unemployed civilian patient or visitor in
> the hospital.  Indeed, in a case in which
> the employment status of the assailant has
> nothing to do with the basis for imposing
> liability on the Government, it would seem
> perverse to exonerate the Government because

> of the happenstance that Carr was on a
> federal payroll.

*Id.* at 402. In short, *Sheridan* recognized the viability of a negligence action against the government related to an intentional tort committed by an individual employed by the government, where the employee did not act within the scope of his employment and the asserted basis for liability is "entirely independent" from the employment relationship.

As explained above, and as the United States itself contends (ECF Nos. 10-1, at 14-15; 13, at 11), Eugene's actions were outside the scope of his employment. Thus, *Sheridan* would indicate that the intentional tort exception is "simply inapplicable." *Sheridan*, 487 U.S. at 400. Moreover, Chang-Williams' claims regarding the United States' failure to protect her are entirely unrelated to the employment relationship between Eugene and the Marine Corps. The purported duty to protect arose not because of Eugene's status as a Marine, but because of the alleged promise members of the Marine Corps voluntarily made to Chang-Williams and her family.[9] *See Rogers*

---

[9] If the Marines did make a promise of protection, it is likely that the promise was motivated by the fact that Eugene was himself a Marine. Any such motivation, however, would not make a difference; even though the act giving rise to liability might have been motivated by the employment relationship, the employment relationship was not a prerequisite to liability.

*v. United States*, 397 F.2d 12, 14 (4th Cir. 1968) ("When an agency of the United States voluntarily undertakes a task, it can be held to have accepted the duty of performing that task with due care."); *accord Bodin v. Vagshenian*, 462 F.3d 481, 489 (5th Cir. 2006) (concluding that claims based on separate duties to protect "do not depend on the employment status of the assailant"); *Matsko v. United States*, 372 F.3d 556, 561 (3[d] Cir. 2004) ("The alleged negligence in this claim stems from the United States' undertaking a duty to protect [the plaintiff]. . . . As in *Sheridan*, this duty is entirely separate from any respondeat superior claim."); *LM ex rel. KM v. United States*, 344 F.3d 695, 700 (7th Cir. 2003) ("[I]n order to invoke the court's jurisdiction under the FTCA, [the plaintiff] had to allege facts that if proven at trial would establish that [the defendant] voluntarily undertook to protect his daughter from [the defendant's employee's] abuse and then negligently performed that duty prior to her actual assault."). The fact that Eugene was a Marine is no more relevant in this case than the fact that the assailant was a sailor in *Sheridan*.

To be sure, a true claim of negligent supervision in this case might be a back-door attempt to raise a *respondeat superior* claim premised on an excepted act, as such claims typically depend on the employment relationship. *Schweizer v. Keating*,

150 F.Supp.2d 830, 843 (D.Md. 2001) ("Under Maryland law, liability for negligent supervision has arisen, almost exclusively, in cases involving master-servant relationships."); *see also Lilly v. United States*, 141 F.Supp.2d 626, 629 (S.D.W.Va. 2001) (concluding that Fourth Circuit's pre-*Sheridan* decisions – which barred negligent supervision claims premised on intentional acts of government employee – continue to apply). But, contrary to the Government's characterizations, the complaint in this case offers more than a negligent supervision claim.[10] Chang-Williams advances a separate and distinct theory of liability premised on the Government's negligence in making and breaching a particular promise of protection. That claim is cognizable despite the intentional tort exception.

---

[10] On reply, the Government argues that Chang-Williams has not actually alleged any failure to protect theory of negligence in her complaint. (ECF No. 13, at 16-17 & n.3). Given that this new argument appeared only on reply, the court should not consider it. But even if the court did entertain the argument, it fails. The complaint states that members of the Marine Corps "promise[d] that Sgt. Eugene was no longer a threat to our family . . . [and] [h]e was supposed to be detained and monitored at Henderson Hall/Fort Myers and would not be able to leave to Barracks unaccompanied." (ECF No. 1, at 2). *Pro se* complaints must be construed liberally, and it is no leap of logic to conclude that such allegations support a claim for failure to protect.

### 3. The Discretionary Function Exception

The Government further argues that the discretionary function exception to the FTCA, found at 28 U.S.C. § 2680(a), applies to Chang-Williams' claims. (ECF No. 10-1, at 17 (citing *Strong*, 573 F.Supp.2d at 886-87)). "[T]he discretionary function exception 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" *Suter*, 441 F.3d at 310 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)).[11] Under the exception, the United States may not be held liable for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Chang-Williams bears the burden of showing that the discretionary function exception does not apply. *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180

---

[11] The Fourth Circuit has called this exception "[t]he most important" exception to the FTCA. *McMellon v. United States*, 387 F.3d 329, 335 (4th Cir. 2004) (en banc).

24

(4th Cir. 2009) (citing *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005)).

Two issues dictate whether an act is discretionary. First, conduct by a federal employee falls within the discretionary function exception when it "'involves an element of judgment or choice.'" *Suter*, 441 F.3d at 310 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). "The discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow because the employee has no rightful option but to adhere to the directive."[12] *Indem. Ins. Co.*, 569 F.3d at 180 (brackets and quotation marks omitted). Second, "even if the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield, that is, decisions grounded in social, economic, and political policy." *Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d

---

[12] Courts have found other situations beyond those noted in *Berkovitz* wherein an agent has "no rightful option but to adhere." *See, e.g.*, *Downs v. U.S. Army Corps of Eng'rs*, 333 F.App'x 403, 409 (11th Cir. 2009) (holding that government's assumption of obligations in binding contract rendered discretionary function exception inapplicable); *Irving v. United States*, 162 F.3d 154, 172 (1st Cir. 1998) (finding government employees had "no rightful option but to adhere" to directives from their supervisors).

201, 208 (4th Cir. 2002) (quotation marks omitted). In considering this step, the court does not focus on "the agent's subjective intent in exercising the discretion . . . , but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991). In other words, determining whether the discretionary function exception applies is not a fact-intensive exercise, as the court will only "look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy." *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993).

The Government asserts that the relevant decisions were entrusted to the discretion of commanding officers. There is certainly something to be said for deference to military decisions. In fact, "when discretionary decisions are ones of professional military discretion, they are due the courts' highest deference." *Minns v. United States*, 155 F.3d 445, 451 (4th Cir. 1998). Nevertheless, not every military decision involving the slightest degree of discretion will escape the reach of the FTCA. *See Loughlin v. United States*, 286 F.Supp.2d 1, 23 n.19 (D.D.C. 2003) (rejecting the suggestion that "all decisions made by the military are automatically protected by

the discretionary function exception"). "[A]lmost every act involves some modicum of discretion regarding the manner in which one carries it out," but granting immunity for all such acts "is not required by the language of the [discretionary function exception] and would undercut the policy aims at the heart of the FTCA." *Coulthurst v. United States*, 214 F.3d 106, 110 (2[d] Cir. 2000); *accord Gaubert*, 499 U.S. at 325 n.7 ("Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy."); *Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995) ("The question is not whether there is any discretion at all, but whether the discretion is grounded in the policy of the regulatory regime. The mere association of a decision with regulatory concerns is not enough; exempt decisions are those fraught with public policy considerations." (quotation marks, citations, and ellipses omitted)). Even when military actors are involved, courts must be careful not to read the discretionary function exception so broadly as to allow it to swallow the whole of the FTCA.

The initial decision to protect was likely a discretionary decision that lies well within the province of military discretion. The Government cites *Strong* for the proposition

that "the determination of whether to 'detain' and 'monitor' a servicemember is left to the discretion of his commanding officer." Likewise, in the civilian context, the Fourth Circuit has held that the decision of whether to protect a particular individual is a "policy decision of the discretionary nature." *Piechowicz v. United States*, 885 F.2d 1207, 1213 (4th Cir. 1989) (quoting *Bergmann v. United States*, 689 F.2d 789, 793 (8th Cir. 1982)).

But while the initial decision to assume a duty may be discretionary, that decision is not what Chang-Williams challenges here. Instead, Chang-Williams challenges certain actions taken *after* the Marine Corps allegedly decided to protect her family. She contends that the Government injured her because its agents negligently breached their initial promise and allowed Eugene to roam free. One could call this a claim based on the dereliction (rather than assumption) of a promise to protect. Thus, the real issue in this case is not whether the decision to protect is discretionary, but whether the agents of the United States performed a discretionary function when they disregarded their own specific assurances to Chang-Williams and her family. *Cf. Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955) ("But once [the agency] exercised its discretion . . . and engendered reliance . . ., it was

obligated to use due care [in the exercise of that discretion].").  For several reasons, the alleged breach of a specific promise of protection was not discretionary.

As previously observed, case law has coalesced around a simple notion: "once federal government officials affirmatively decide to undertake to carry out a duty, the discretionary function exception of section 2680(a) may not be applicable if those officials perform that duty negligently, even though their decision whether or not initially to undertake that duty was itself discretionary." *Piechowicz v. United States*, 685 F.Supp. 486, 498 (D.Md. 1988); *see also Coyne v. United States,* 270 F.Supp.2d 104, 118 (D.Mass. 2003), *rev'd on other grounds by* 386 F.3d 280 (1st Cir. 2004) ("Coyne's allegation that the government did *nothing* to protect him after voluntarily taking on the obligation to do so is actionable."); *Miller v. United States,* 530 F.Supp. 611, 615 (E.D.Pa. 1982) ("[C]ourts have . . . recognized that, where the government enters into a special relationship with an individual, the government may not have any discretion as to whether to protect that individual. . . . At least two federal courts have held that . . . the negligent performance of that duty [to protect] is not shielded by the discretionary function exception." (footnote omitted)). Although the Fourth Circuit has not apparently decided whether

the breach of a specific promise to protect is a discretionary act, other federal courts have.

In *Ochran v. United States*, 117 F.3d 495 (11th Cir. 1997), for example, the United States Court of Appeals for the Eleventh Circuit determined that a witness could not bring suit under the FTCA against an Assistant United States Attorney who promised to protect him from an attacker and failed to do. Although the promise of protection may have created a "special relationship" between the victim and the attorney, the decision as to how to protect the victim still involved the exercise of judgment. *Id.* at 506. Importantly, however, the court "emphasize[d]" that "these dealings did not involve a promise to perform specific actions on the [victim]'s behalf." *Id.* at 506 n.7. The absence of a specific promise was important because "[a] different result might have been reached . . . had [the attorney] voluntarily assumed a specific duty that involved no policy judgments . . . [such as] promising [the victim] that she would station U.S. Marshals at her door." *Id.*[13]

---

[13]    *But see Shuler v. United States*, 531 F.3d 930, 936 (D.C. Cir. 2008) (disagreeing with *Ochran* because the "agent's promise does not become a specifically prescribed government policy to which 'the employee has no rightful option but to adhere'").

Chang-Williams does not — and could not – point to any applicable federal statue, regulation, or policy that prescribed the Marines' conduct in this case.[14]  As such, it cannot be said that one of these formal directives stripped the decision of any element of choice.  Nevertheless, as *Ochran* suggests, it is hard to see how the actions of the United States would involve "judgment" or "choice" if it assumed a duty to take certain particular actions and wholly failed to do so.  The Marine Corps allegedly provided not just a general offer of protection, but stated to specific individuals that they would be protected by specific procedures that the Marine Corps intended to implement.  For a choice to be truly discretionary there must be some necessary consideration of two or more real alternatives that fundamentally relate to policy choices.  There must be "room for choice."  *Gaubert*, 499 U.S. at 324.  There is no apparent room here.[15]

---

[14]   Nor does the Government argue that there is any statute, regulation, or policy allowing it.

[15]   Indeed, in at least one other case, the Government itself has conceded that a failure to protect following an explicit, specific promise of protection may fall outside the exception.  *See Merced v. City of New York*, 856 F.Supp. 826, 831 (S.D.N.Y. 1994) (observing that "[t]he Government admits that it may have a legal duty to protect" that would fall outside the discretionary exception "if it voluntarily assumed or incurred that duty to a specific individual" (quotation marks omitted)).

Moreover, if the facts are as Chang-Williams alleges, there are no apparent "social, economic, [or] political" considerations that would underlie the United States' decision to ignore its own promise. *Smith*, 290 F.3d at 208. If Chang-Williams proves that the explicit promise was made, any policy considerations would have been weighed and the Marine Corps was obligated to act, or at the very least to inform Chang-Williams that it did not intend to protect her after all. *Cf. Whisnant v. United States*, 400 F.3d 1177, 1182 (9th Cir. 2005) ("Safety measures, once undertaken, cannot be shortchanged in the name of policy." (quotation marks and brackets omitted)).

In sum, the FTCA provides the court with the jurisdiction to consider Chang-Williams' negligent failure to protect claims.

**B.    Chang-Williams' Personal Injuries**

The FTCA only provides jurisdiction, not the substantive cause of action. Thus, "an action under [the] FTCA exists only if the State in which the alleged misconduct occurred would permit a cause of action for that misconduct to go forward." *Carlson v. Green*, 446 U.S. 14, 23 (1990); *see also Florida Auto Auction of Orlando, Inc. v. United States*, 74 F.3d 498, 502 (4th Cir. 1996) ("The Act does not create new causes of action[.] . . . Instead, the Act only serves to convey jurisdiction when

32

the alleged breach of duty is tortious under state law."
(quotation marks omitted)).

The parties assume that Maryland law applies. Although
they are correct, the matter is not as simple as it might
appear. "The [FTCA] requires the government's liability to be
determined 'in accordance with the law of the place where the
act or omission occurred.'" *United States v. St. Louis Univ.*,
336 F.3d 294, 300 (4th Cir. 2003) (quoting 28 U.S.C. §
1346(b)(1)). The place where the "act or omission occurred" is
the "place where the acts of negligence took place," not the
place of the injury. *Richards v. United States*, 369 U.S. 1, 10
& n.20 (1962). Although Chang-Williams was injured in Maryland,
the alleged negligent act in this case took place at the
military base in Virginia where Eugene allegedly should have
been detained. Therefore, the law of Virginia applies,
including its choice-of-law principles. *See St. Louis Univ.*,
336 F.3d at 300 ("[T]he 'law of the place' refers to the 'whole
law,' including choice-of-law principles." (quoting *Richards*,
369 U.S. at 11)). "The settled rule" in Virginia is that courts
look to "the lex loci delicti, or place of the wrong," to
determine what substantive tort law to apply. *Jones v. R.S.
Jones & Assocs., Inc.*, 246 Va. 3, 5 (1993). "Under Virginia
law, the place of the wrong or injury is the place where the

33

injury was suffered, not where the tortuous act took place."
*Feeley v. Total Realty Mgmt.*, 660 F.Supp.2d 700, 713 (E.D.Va.
2009). Thus, the substantive law of Maryland should be used to
determine the potential tort liability of the United States.

Chang-Williams seeks to recover for her own injuries by
alleging that the United States negligently failed to protect
her from Eugene. In Maryland, a private party generally has no
duty "to control a third person's conduct so as to prevent
personal harm to another, unless a 'special relationship' exists
either between the actor and the third person or between the
actor and the person injured." *Gourdine v. Crews*, 405 Md. 722,
746 (2008) (quoting *Ashburn v. Anne Arundel Cnty.*, 306 Md. 617,
628 (1986)); *see also Scott v. Watson*, 278 Md. 160, 166 (1976)
("[A] private person is under no special duty to protect another
from criminal acts by a third person, in the absence of
statutes, or of a special relationship."). This "special
relationship" exception to the general bar against liability is
narrowly construed. *Patton v. U.S. of Am. Rugby Football*, 381
Md. 627, 642 (2004). The special relationship issue is
determined on a "case-by-case basis." *McNack v. State*, 398 Md.
378, 399 (2007) (quotation marks omitted).

Chang-Williams argues that she had a special relationship
with the Marine Corps by virtue of the promise the Corps made to

protect her and her family. The Government responds that several required elements of a special relationship are lacking here. Specifically, the Government finds fault with Chang-Williams' claims because (1) the Marine Corps did not place Eugene in custodial confinement; (2) the Marine Corps never made a direct promise of protection to Chang-Williams; (3) the Marine Corps did not take any affirmative steps to provide protection; and (4) Chang-Williams did not rely on the promise.[16] Each argument will be addressed in turn.

### a. Custodial Confinement

Chang-Williams is not required to show "custodial confinement" to establish a special relationship in this case. *Holson v. State*, 99 Md.App. 411, 424 (1994) ("Until the door to duty, foreseeability, ordinary care, etc., is opened by a custodial *or other special relationship*, suits in negligence based upon negligent omission, such as that in the case at bar,

---

[16] The Government raises an additional argument concerning foreseeability in its reply, wherein it accuses Chang-Williams of trying to punish Defendant for a lack of "clairvoyance." (ECF No. 13, at 1-2, 24-25). Typically, courts will not consider an argument raised for the first time in a reply brief. *Clawson v. FedEx Ground Package Sys.*, 451 F.Supp.2d 731, 734 (D.Md. 2006); *see also United States v. Williams*, 445 F.3d 724, 736 n. 6 (4th Cir. 2006). Such arguments prejudice an opposing party who does not have an opportunity to respond. *Hunt v. Nuth*, 57 F.3d 1327, 1338 (4th Cir. 1995). The court will not consider the foreseeability argument.

cannot be successfully maintained." (emphasis added)). A duty to protect may arise when either of two relationships exists: "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection." *Remsburg v. Montgomery*, 376 Md. 568, 590 (2003). The requirement of a "custodial situation" relates to the *first* of the two possible relationships: a relationship between the "actor" (*i.e.*, the Marine Corps) and the third person (*i.e.*, Eugene). *Id.* at 592. If such a relationship were shown, the United States might have had a general duty to restrain Eugene and prevent him from harming the public at large.

That relationship is not what is alleged in the present case. Instead, Chang-Williams relies on the *second* type of relationship, which exists between the "actor" (*i.e.*, the Marine Corps) and the "other" (*i.e.*, Chang-Williams). (*See, e.g.*, ECF No. 1, at 2 (discussing the promise the Marine Corps made to Chang-Williams' family). Maryland law does not impose a "custodial requirement" for this relationship, but instead looks to whether there is an "element of dependence" in the relationship between Chang-Williams and the Marine Corps. *Remsburg*, 376 Md. at 594. In other words, courts look for a

36

"dependence and ceding of self-control," which may be found where the injured parties "entrusted themselves to the control and protection" of the purported protector. *Patton*, 381 Md. at 642.

The Government does not fully address the issue of dependence. Nevertheless, it is quite clear that there is a material dispute of fact concerning whether the requisite dependence is present. The Government avers that no promise of protection was ever made to Chang-Williams. If that were the case, it would be difficult to find dependence between an otherwise ordinary group of civilians and the Marine Corps. Indeed, many of the cases cited by the United States – wherein no duties to protect were found – involve just such facts. *See, e.g.*, *Dunk v. United States*, No. 95-1149, 1996 WL 34366, at *3 (4th Cir. Jan. 30, 1996) ("[T]he Marine Corps police did not have a duty to provide continual police protection to Mrs. Dunk. . . . She was merely the wife of a Marine Corps servicemember and a resident on a military base, a status no different from that of any other citizen living in military housing."); *Strong*, 573 F.Supp.2d at 886 ("[T]hese regulations were not implemented for the benefit of civilians living off base, . . . thus no duty of protection to them can arise therefrom."). But if the Marine Corps did make a specific offer of protection, that promise

transformed the relationship, such that a reasonable factfinder could conclude that the relationship of dependence resulted. *Compare Dunk*, 1996 WL 34366, at \*3 ("Mrs. Dunk had a restraining order against her husband, that order *did not constitute an express promise* by the military police to protect Mrs. Dunk from her husband." (emphasis added)).

Alternatively, Maryland courts "have found that a 'special relationship' may be created in limited circumstances by virtue of a party's actions." *Remsburg*, 376 Md. at 595. Such cases typically arise in the context of actions taken by public officials, but may also arise in private situations that involve "conduct by one party that ordinarily induces reliance by the injured party upon the acting party." *Id.* at 599. For an action to create a special relationship, it must "involve[] more than general actions." *Muthukumarana v. Montgomery Cnty.*, 370 Md. 447, 499 (2002).

The acts alleged by Chang-Williams fall within such an exception. As explained above, the assurances Chang-Williams alleges that she received constitute more than just generalized protection. Instead, they involve promises that the Marine Corps would undertake a particular course of conduct to protect a particular class of people – Rhea's family. The lack of any

custodial confinement does not change these facts and does not require dismissal.

### b.  Direct Promise

The Government also argues that no adequate promise of protection was actually made because (1) the Marines did not speak directly with Chang-Williams and (2) any promise of protection for the "family" would be too "nebulous" to create a duty.  (ECF Nos. 10-1, at 20; 12, at 20).  Fundamentally, these contentions are attempts to re-characterize the facts in a light less favorable to Chang-Williams by labeling the alleged promise as "indirect" or "nebulous."  As explained above, the Maryland courts look to whether there is a relationship of dependence or conduct that spurs reasonable reliance.  If Chang-Williams is to be believed, there are sufficient facts presented for a reasonable fact-finder to conclude that the Marines meant for protection to extend to Chang-Williams and the other occupants of her home.  No Maryland court has demanded a "direct" promise.

The cases the Government cites do not affect the court's analysis.  In *Semple v. City of Moundsville*, 195 F.3d 708, 714 (4th Cir. 1999), for instance, the Fourth Circuit applied West Virginia's formulaic four-part standard for determining whether a special relationship exists.  That standard does have a direct contact requirement, but Maryland has specifically declined to

apply West Virginia's standard; it instead chose to apply the more fluid approach already articulated herein. *See Muthukumarana*, 370 Md. at 493 (citing *Wolfe v. City of Wheeling*, 182 W.Va. 253 (1989)). Maryland law recognizes that unbending requirements may fail to account for the eccentricities of a particular situation. *Id.* at 496 ("Although we acknowledge that a more formulaic special relationship test may facilitate greater predictability, our review of the many different special relationship requirements adopted by other jurisdictions reinforces our choice not to incorporate a more regimented approach into Maryland's special relationship test."). It is also true that the Fourth Circuit found no special relationship in the unreported *Dunk* case because "the military police did not *expressly* promise Mrs. Dunk that they would protect *her* from her husband." *Dunk*, 1996 WL 34366, *4 (Government's emphasis). But here again, *Dunk* is of limited utility because it applies the law of North Carolina, not Maryland. In addition, even if it did apply, nothing in *Dunk* suggests a promise must be made face-to-face to give rise to a duty to protect.[17] In this case, the Marines' promise of protection was express in the sense that

_____

[17] To the extent *Dunk* could be read to require some higher level of explicitness, it would run contrary to Maryland's willingness to imply a special relationship "by virtue of a party's actions." *Remsburg*, 376 Md. at 595.

they explicitly offered safety to a defined group of people, the Chang-Williams family.

The Government also cites *Muthukumarana* as authority for the proposition that direct contact is required. In that case, the Court of Appeals of Maryland considered, among other things, whether a special relationship had been formed between a 911 caller's two children and a 911 dispatcher. The children's mother had called the 911 operator after she was attacked by their father; during the course of the call, the father returned to kill the mother, the children, and himself. *Id.* at 465-68. Only the mother spoke on the phone to the dispatcher and the dispatcher was entirely unaware that the two children were even present during the events. *Id.* Based on these facts, the court concluded that no special relationship had formed between the children and the dispatcher because the dispatcher had not taken "any action to protect or assist [the children] directly." *Id.* at 502-03.

*Muthukumarana* is distinguishable from this case. The 911 dispatcher in *Muthukumarana* had no idea that any parties other than the mother were involved. In contrast, the Marines here were purportedly aware of Chang-Williams and her family's existence. The Marines are alleged to have been told about the specific threat to her and her household. According to Chang-

Williams, they then took action directed at her by stating that her family would be protected.  In other words, all the members of "the family" fell under the umbrella of the promise – and the Marines acted to protect a "specific group of individuals like the victim, thereby inducing the victim's specific reliance." *Id.* at 463 (*quoting Fried v. Archer*, 139 Md.App. 229, 251 (2001)).  The alleged conduct of the United States was sufficiently directed towards Chang-Williams to justify reliance.

### c.  **Affirmative Acts**

The United States further contends that Chang-Williams has not established "any single affirmative act that was taken to protect her, her husband, or her son."  (ECF No. 13, at 21).  Relying on *McNack,* the Government argues that "the Marine Corps would have had to place Plaintiff and her husband and son into protective custody before there was a sufficient affirmative act upon which a special relationship could be based."  *McNack*, 398 Md. at 402.  Ultimately, however, this argument does not justify entering summary judgment at this time.

Preliminarily, Chang-Williams' contention (ECF No. 12, at 7) that the military protection order was a sufficient affirmative act to support a special relationship is incorrect.  The order did not name Chang-Williams, her husband, or her son,

42

but only applied to Nakeisha Rhea. (ECF No. 12-7, at 1). Although the order indicated that Eugene was not to contact Rhea via "third parties," the solitary reference to such parties is too attenuated to conclude that the order reflected an intention to shield Chang-Williams.[18]

Nevertheless, the specific assurances and promises of protection allegedly provided here may constitute affirmative acts that will support a special relationship, particularly when coupled with evidence of reliance. *McNack* does not compel the conclusion that specific promises are always insufficient to constitute affirmative acts.

To understand why, one first must fully understand *McNack*. *McNack* involved a family of seven, the Dawsons, who lived in a neighborhood plagued by drug dealers. 398 Md. at 386. In an effort to stem the drug activity, the Dawsons often called the Baltimore City Police Department to report crimes. *Id.* The neighborhood drug dealers did not take kindly to the family's involvement: men threw bottles at the home, vandalized the house with spray paint, and assaulted members of the family.

_____

[18] Chang-Williams also states in her opposition that certain Marine Corps officers, "after repeated telephone calls, continued to assert that they were detaining [Eugene]." (ECF No. 12, at 7). Because she does not provide any admissible evidence in support, these alleged assertions cannot be considered on the summary judgment record.

*Id.* at 386-87. After someone threw a Molotov cocktail through their kitchen window, the Dawsons sought and obtained offers of protection from both the police and the Baltimore City State's Attorney's office. *Id.* at 387. In particular, the police promised to place the Dawsons on "Special Attention List," while "an individual within the Baltimore City State's Attorney's office verbally offered protection to the Dawsons" in the state's witness protection program. *Id.* at 387. Unfortunately, neither agency followed through on its promises. *Id.* As a result, the family never received their promised protection. *Id.* A drug dealer subsequently broke into the home and set it ablaze, killing the entire family. *Id.*

Relatives of the Dawson family filed suit against the State of Maryland and the Mayor and City Council of Baltimore. On appeal, the Court of Appeals rejected the relatives' contentions that the promises of protection from the police and the State's Attorney's office gave rise to special relationships with the Dawsons. *See id.* at 401 (finding that police's promise to give family special attention "does not indicate that the police affirmatively acted towards the Dawsons in any manner different than they would respond to any member of the general public."); *id*. at 401-02 ("[T]here was no special relationship between the Dawson family and the Assistant State's Attorney who allegedly

offered them protection but then failed to complete the paperwork. There was no affirmative act. There was only an alleged omission.").

The outcome in *McNack* was apparently motivated by a fear of imposing liability on state actors for things they commonly do. In finding no special relationship, the court stressed that it was acting out of concern that a more expansive approach to such relationships would hinder the police "in respect to their response to the numerous calls for help that occur in this State on a daily basis." *Id.* at 402. Specifically, the court was especially unwilling to apply the doctrine broadly in the realm of "emergency services," where "'the circumstances are often demanding and . . . some mistakes will occur.'" *Id.* at 403 (quoting *Muthukumarana*, 370 Md. at 490-91). Thus, *McNack* falls in line with a number of other Maryland cases that declined to find affirmative acts where the proposed "acts" were general deeds or statements made by government officials commonly directed at members of the public. *See, e.g.*, *Pendleton v. State*, 398 Md. 447, 487 (2007) (finding that placement of child in foster care was not affirmative act where it was "statutorily mandated and required act of the State"); *Muthukumarana*, 370 Md. at 498-99 (holding 911 dispatcher's promise to "send someone out" was not affirmative act, as "there [wa]s no indication that

45

[the dispatcher]'s handling of [a victim]'s call exceeded or was markedly different than her handling of other similar calls and situations"); *Pulliam v. Motor Vehicle Admin.*, 181 Md.App. 144, 172 (2008) ("Here, the steps taken by the MVA and MAB were designed to protect both Grimes and the public at large.").

But in *Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 150-51 (2000), the Court of Appeals of Maryland reversed an award of summary judgment for the defendant, where a more specific promise of protection was made. In *Williams*, Mary Williams came home to find that her daughter, Valerie Williams, had been badly beaten by her boyfriend, Gerald Watkins. *Id.* at 109. After Mary called 911, Officer Edward Colbert responded. *Id.* Mary and Valerie described Watkins' violent past to the officer, who was also made aware that Watkins had threatened to return to the home. *Id.* After some investigation, Colbert went outside, sat in his car, and wrote his report. *Id.* at 110. When Mary came outside to speak with Colbert, he told her, "[G]o in the house, I'm going to be here." *Id.* Unfortunately, after Mary returned to house, Colbert instead left the scene. *Id.* After the officer left, Watkins returned to the home and shot both Mary and Valerie before killing himself. *Id.*

Mary survived the attack and filed suit against several parties, including Officer Colbert. Although the trial court

granted summary judgment, the Court of Appeals reversed, finding that a duty to protect could have arisen under Mary's version of the facts:

> According to her deposition, Officer Colbert told her that he had to write his report and that she was to go in the house, because he was going to remain outside. While the officer may have had no duty to remain, if in fact he told Mrs. Williams that he would remain to protect them, he may have created a special relationship further creating a duty either to remain or to inform them that he was leaving.

*Id.* at 150-51. The court concluded by holding "that Officer Colbert's affirmative actions and specific promises of protection to Mary and Valerie Williams, if in fact they occurred, are sufficient to have created a special relationship between himself and Mary and Valerie Williams." *Id.* at 151.[19]

*Williams* and *McNack* reflect a carefully balanced approach to liability in the emergency services context. *McNack* and its kindred cases reflect the Court of Appeals' hesitancy to expand liability in a context where decisions are often made in the heat of the moment. *Horridge v. St. Mary's Cnty. Dep't of Soc. Serv.*, 382 Md. 187-88 (2004). Moreover, because police officers and other officials are in the "business" of offering

---

[19]    More recently, the Court of Appeals of Maryland favorably cited *Williams* in defining an "affirmative act." *See Pendleton v. State*, 398 Md. 447, 487 (2007).

protection, they would often find themselves facing liability if gratuitous promises were enough. *See, e.g.*, *Morgan v. District of Columbia*, 468 A.2d 1306, 1313 (1983) (finding that police's promise is not an affirmative act because the "promise to act adds nothing to the obligation law enforcement officers have already assumed as members of a police force guided exclusively by the public interest"). Yet *Williams* would seem to indicate that liability can attach, even in the emergency services context, when an official goes "above and beyond" the ordinary acts taken in a typical case. Thus, a common sense reading of the cases suggests that a special relationship exists, even as to public officials, when their acts are so out-of-the-ordinary that they justify unique reliance.

Of course, the present case does not arise in the emergency services context. Unlike police officers and other public officials, the Marine Corps was not required to inject itself into this situation. The Corps had no obligation to protect Chang-Williams and her family, as she was off base. Thus, when the Corps purportedly offered definite steps that it would undertake to protect Chang-Williams and her family, it did assume additional, exceptional duties. In that way, this case might be closer to *Williams* than *McNack*.

The common law, as articulated in the Restatements, also lends support to Chang-Williams' position that a promise may constitute an affirmative act in circumstances such as these. Maryland courts often look to Restatements such as the Restatement (Second) of Torts for guidance in shaping and applying tort principles. *See, e.g.*, *Appiah v. Hall*, 416 Md. 533, 558-66 (2010) (analyzing various sections of the Restatement (Second) of Torts; *Gourdine v. Crews*, 405 Md. 722, 738-42 (2008) (relying on several provisions of the Restatement (Second) of Torts; *see also Housand v. Bra-Con Indus., Inc.*, 751 F.Supp. 541, 545 (D.Md. 1990) (calling the Restatement (Second) of Torts a "common source" of Maryland law). One section of the Restatement that has previously been cited and considered in Maryland is Section 323. *See, e.g.*, *Davis v. Johns Hopkins Hosp.*, 330 Md. 53, 69 (1993); *Krieger v. J.E. Greiner Co., Inc.*, 282 Md. 50, 72 (1978).

In a caveat to Section 323 of the Restatement (Second) of Torts, the American Law Institute declined to express an opinion as to whether "the making of a contract, or a gratuitous promise, without in any way entering upon performance, is a sufficient undertaking to result in liability under the rule stated in this Section." In Comment *d* to Section 323, the Institute explains that the caveat stemmed from the shifting

status of the law. The comment notes that courts traditionally distinguished between total non-performance of a promise and the negligent performance of a promise. Mere non-performance of a promise could be sued upon only in assumpsit, not in tort. *See also Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 256 (1999) (distinguishing between "nonfeasance" and "misfeasance"). The Commentary goes on to explain, however, that the distinction waned as courts (a) found increasing difficulties in making distinctions between nonfeasance and misfeasance;[20] (b) embraced principles such as promissory estoppel that allowed parties to enforce promises without consideration; and (c) stretched to find "affirmative acts" in trivial conduct. For all these reasons, the Institute left open the question whether liability would attach on a mere promise, but concluded that "[t]here is no essential reason why the breach of a promise which has induced reliance and so caused harm should not be actionable in tort. This is true particularly where the harm is physical harm, to the person, land, or chattels of the plaintiff."

The Institute chose to put the issue to rest in Comment *e* to Restatement (Third) of Torts § 42:

---

[20] Maryland courts have noted the declining influence of the distinction. *See, e.g.*, *Fried v. Archer*, 139 Md.App. 229, 245 n.4 (2001) ("We think this distinction [between nonfeasance and misfeasance] has been persuasively criticized.").

The crux of a duty based on a promise is that the actor engage in behavior that leads another person to forgo available alternatives for protection. Whether that behavior consists of action or a promise should not matter. Thus, this Section revives the rule in § 325[21] of the first Restatement of Torts by recognizing that a promise without any action in furtherance of it is an undertaking subject to the rule stated in this Section.

Some state courts have explicitly embraced the position found in the Second Restatement caveat and Third Restatement Commentary. *See, e.g.*, *Jenkins v. Best*, 250 S.W.3d 680, 695 (Ky.App. 2007); *Osborn v. Mason Cnty.*, 157 Wash.2d 18, 26 (2006); *Bourgonje v. Machev*, 362 Ill.App.3d 984, 997 (2005). Maryland has not directly addressed the Restatements' treatment of the issue. Importantly, however, in some of the few special relationship cases that do not deal with public officials,[22] the Court of Appeals has echoed the more permissive approach found

---

[21] "Liability for an omission to perform a voluntary undertaking is covered in section 325 of the first Restatement." *N.W. v. Amalgamated Trust & Sav. Bank*, 196 Ill.App.3d 1066, 1072-73 (1990).

[22] Cases involving private parties are more useful because the FTCA "requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability." *United States v. Olson*, 546 U.S. 43, 46 (2005). Cases involving public officials are considered herein only because the Court of Appeals has looked to such cases to "extract . . . general principle[s]" in analyzing a failure to protect claim against a private individual. *Remsburg*, 376 Md. at 599.

in the Third Restatement, tacitly eschewing a strict requirement that performance actually be commenced. Instead, the court looked merely for "the existence of conduct by one party that ordinarily induces reliance by the injured party upon the acting party." *Remsburg*, 376 Md. at 599; *see also Patton*, 381 Md. at 642 (asking only whether there was a "ceding of self-control" by the purportedly protected party). Chang-Williams has produced evidence that could meet the test articulated by the Third Restatement and *Remsburg*. The alleged promise induced reliance such that Plaintiff and her family did not undertake to protect themselves. Consequently, given the approach taken in *Remsburg* and the current trend in the law, it cannot be said that Chang-Williams has unequivocally failed to provide sufficient evidence of an affirmative act in the context of a promise to protect.

### d. Reliance

Finally, the Government maintains that Chang-Williams has not shown that she relied on the assurances of the United States, as "she and her family went about their routines as normal." (ECF No. 13, at 23). Pointing to *McNack*, the Government says that Chang-Williams and her family should have "alter[ed] their behavior or location." (*Id.*). The Government has it backwards. If the Chang-Williams household had believed that the military did not intend to protect them, one would have

expected them to take some protective measures of their own, such as moving to a different location. Instead, in reliance on the military's promise of safety, they decided *not* to take their own actions and remained in their vulnerable positions. (*See, e.g.*, ECF Nos. 12-2, Aff. of Angele Chang-Williams, at 2 ("My family believed that the Marine Corps Officers would not allow Sergeant Eugene to be out roaming around. We went about our usual routine."); 12-3, Aff. of Ursula Charley, at 2 ("We went walking around. If we did not believe the promise of protection we would have stayed [in]side. My sister Angele would have warned her son to be careful and to be on watch."); 15-2, Decl. of Carolyn Rhea, at 2 ("We would have tried to protect oursel[ves] if we would have known he was not detain[ed] on the base.")). Such carefree behavior is the opposite of the Dawsons' behavior in *McNack*, where the family was "preparing to move." 398 Md. at 401. That behavior reflected that the Dawsons placed little reliance on their promise of protection.

Moreover, the fact that Rhea obtained a state protective order does not dispel any reliance on the part of Chang-Williams (or her family, for that matter). Rhea's request for such an order might reflect that she did not trust the Marine Corps' alleged assurances, but it does not speak to the state of mind of Chang-Williams and her household. If anything, the fact that

Chang-Williams, her husband, and her son did not seek such an order for themselves - despite their apparent fears - further supports the notion that they *were* acting in reliance on the Marine Corps' promise.

**C.   Wrongful Death Claims**

In addition to claims for her own personal injuries, Chang-Williams brings a wrongful death action premised on the deaths of her husband Kelvin and her son Aldwin.   Here again, it must be determined which state's law would apply.   The FTCA directs that the "whole law" of Virginia should apply.   *Richards*, 369 U.S. at 10 & n.20.   Virginia applies the substantive law of the place of injury, which in this case is Maryland.   *See Jones*, 246 Va. at 5 (applying Florida wrongful death statute where injury occurred in Florida); *see also Estate of Sa'adoon v. Prince*, 660 F.Supp.2d 723, 725 (E.D.Va. 2009); *cf. Richards*, 369 U.S. at 15-16 (applying Missouri wrongful death statute in FTCA case where law of the state where negligence occurred – Oklahoma – looked to the law of the place of injury – Missouri).

Still, the Maryland Wrongful Death Act directs that, "[i]f the wrongful act occurred in another state . . . a Maryland court shall apply the substantive law of that jurisdiction."   Md. Code Ann., Cts. & Jud. Proc. § 3-903; *see also Jones v. Prince George's Cnty.*, 378 Md. 98, 107-08 (2003) ("Under the

plain language of the statute, it is the place of the wrongful
act, and not the place of the wrongful death, which determines
the substantive tort law to be applied in a particular wrongful
death action."). The "wrongful act" is defined as the "law of
the state where the injury or act resulting in death occurred."
*Jones v. Jones*, 172 Md.App. 429, 443 (2007) (brackets omitted)
(quoting *Kaufmann v. Serv. Trucking Co.*, 139 F.Supp. 1, 5 (D.Md.
1956)). Although the initial breach of protection occurred in
Virginia, the consequent injuries to Kelvin and Aldwin occurred
in Maryland. Thus, the court should look to Maryland law to
define the relevant duties and rights of the parties.[23]

------

[23] Even if the wrongful act did occur in Virginia, the
choice-of-law provision found in the Maryland Wrongful Death Act
would not lead the court to apply Virginia law. When applying
Virginia's choice-of-law rules, the court ordinarily would
ignore Maryland's choice-of-law mandates. To do otherwise would
result in *renvoi*, wherein "a court resorting to foreign law
adopts as well the foreign law's conflict-of-laws principles,
which may in turn refer the court back to the law of the forum."
*Sosa v. Alvarez-Machain*, 542 U.S. 692, 757 n.3 (U.S. 2004)
(quotation marks omitted) (Ginsburg, J., concurring). "Virginia
is a traditional state . . . [that] adheres to traditional
conflict-of-law rules, when presented with a choice-of-law
question." *Hatfill v. New York Times Co.*, 459 F.Supp.2d 462,
465 (E.D.Va. 2006). As a result, no Virginia court has ever
employed *renvoi*. *See Asbestos Removal Corp. of Am., Inc. v.
Guaranty Nat'l Ins. Co.*, No. 94-1192, 1995 WL 83783, at *1 (4th
Cir. Mar. 2, 1995); *Boston Mut. Life Ins. Co. v. Ludwig*, No.
1:06CV1072, 2007 WL 1448708, at *3 n. (E.D.Va. May 10, 2007);
*Adams v. Alliant Techsystems Inc.*, 218 F.Supp.2d 792, 801 n.11
(W.D.Va. 2002). To the extent that the Maryland Wrongful Death
Act attempts to dictate choice-of-law, Virginia choice-of-law
principles would ignore it.

The same acts that give rise to liability as to Chang-Williams also give rise to liability as to Kelvin and Aldwin. Kelvin and Aldwin were within the protected class of individuals allegedly offered safety by the Government. They were residents at a house that was specifically expected to be protected. By breaking its alleged promise and failing to restrain Eugene, the United States caused injury to those two individuals.[24]

The wrongful death action, however, cannot proceed as it is currently styled. The Maryland Wrongful Death Act requires all beneficiaries to bring their claims in a unitary action. *See*

---

[24]     Given the substantial consideration already given to Virginia law, it is worth noting that Virginia law regarding the duty to protect largely tracks the law in Maryland. Virginia courts "have consistently held that generally a person does not have a duty to protect another from the conduct of third persons." *Kellermann v. McDonough*, 278 Va. 478, 492 (2009) (quotation marks omitted). Like Maryland, the law of Virginia recognizes certain exceptions to that general rule "when a special relationship exists between a defendant and a plaintiff that gives rise to a right to protection to the plaintiff." *Id.* A special relationship may arise "as a matter of law or because of the particular factual circumstances in a given case, which may give rise to a duty of care on the part of the defendant to warn and/or protect the plaintiff against the danger of harm from the reasonably foreseeable criminal acts committed by a third person." *Thompson ex rel. Thompson v. Skate Am., Inc.*, 261 Va. 121, 129 (2001). Virginia also embraces the "ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Didato v. Strehler*, 262 Va. 617, 628 (2001) (quotation marks omitted); *see also Kellerman*, 278 Va. at 487 (finding that an adult who assumes duty of supervision over child must discharge that duty with reasonable care).

Md.Code Ann., Cts. & Jud.Proc. § 3-904(f).   As Judge Motz

previously explained:

> Maryland's wrongful death statute explicitly
> permits only one wrongful death lawsuit to
> be brought by the beneficiaries of a
> decedent.   In that single action, the
> beneficiaries of the decedent-including the
> decedent's spouse, parents, and children,
> who are considered "primary beneficiaries" –
> share any damages that are awarded in
> proportion to the injuries they suffered as
> a result of the decedent's death.
>
> Maryland law thus makes clear that all
> beneficiaries in wrongful death lawsuits are
> the real parties in interest in these suits.
> Indeed, if one of a decedent's beneficiaries
> is absent from a wrongful death lawsuit,
> Maryland law requires that a judgment
> rendered in favor of the beneficiary or
> beneficiaries who did prosecute the suit be
> vacated.

*Johnson v. Price*, 191 F.Supp.2d 626, 629 (D.Md. 2001) (citations

omitted).   Because the judgment may be vacated if a wrongful

death beneficiary is not included in the action, "the court

cannot accord complete relief among existing parties" when a

beneficiary is excluded.   Fed.R.Civ.P. 19(a)(1)(A); *see also*

*Ward v. Walker*, No. RDB 09-3256, 2010 WL 2902777, at *3 (D.Md.

July 26, 2010) (holding that decedent's daughter was necessary

party to Maryland wrongful death action); *Johnson*, 191 F.Supp.2d

at 630 (same).   That renders every wrongful death beneficiary a

necessary party.

The proper beneficiaries are defined by statute. The Maryland Wrongful Death Act states that, with certain exceptions not relevant here, a wrongful death action "shall be for the benefit of the wife, husband, parent, and child of the deceased person." Md.Code Ann., Cts. & Jud.Proc. § 3-904(a)(1). Thus, as to Aldwin, Chang-Williams is the only proper beneficiary (assuming that he was not married and did not have any children). As to Kelvin, though, there are three proper beneficiaries: Chang-Williams, DeLisia Carpenter, and Vinele Chang. Neither DeLisia nor Vinele are presently parties to this action. Yet as the two daughters of Kelvin, DeLisia and Vinele are necessary parties who must be present in the action to protect their interests. Therefore, Chang-Williams is directed to file a new, amended complaint listing Vinele and DeLisia as plaintiffs here. *See* Fed.R.Civ.P. 19(a)(2) ("If a person has not been joined as required, the court must order that the person be made a party."). Chang-Williams is also instructed to notify the court if either Vinele or DeLisia is a minor,[25] or if there exist other statutory beneficiaries (*e.g.*, surviving parents of Kelvin, other children, etc.) who should be included.

---

[25] Special obligations arise as to minors. *See* Fed.R.Civ.P. 17(c).

The Government protests that "Chang-Williams is the only Plaintiff in this action, and pursuant to 28 U.S.C. § 2401(b) all other persons (including Vinele Chang and De[L]isia Carpenter) are barred from attempting to raise through this lawsuit . . . any claims they may hold related to this incident." (ECF No. 13, at 7). The Government's reference is to the statute of limitations for FTCA actions, which requires that all actions be brought "within six months after the date of mailing . . . of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b). Because more than six months have passed since the Navy mailed its denial letter on September 29, 2009, the Government "assumed" that Vinele and DeLisia "abandoned" their claims. (ECF No. 13, at 7).

The FTCA's statute of limitations will not bar the addition of Vinele and DeLisia. "Where . . . defendants have been fully apprised of a claim arising out of specified conduct alleged in the original complaint and thereby have notice of that claim, and where defendants have not demonstrated that they would be prejudiced by the adding of new plaintiffs, the claims of the new plaintiffs asserted in an amended complaint involving the same conduct alleged in the original complaint 'relate back' to the filing date of the original complaint for limitations

59

purposes." *Arrington v. Colleen, Inc.*, No. AMD 00-191, 2000 WL 34001056, at *8 (D.Md. Aug. 7, 2000) (Davis, J.); *see also* Fed.R.Civ.P. 15(c). This permissive approach serves the underlying purposes of the Federal Rules. In the Fourth Circuit, "is well-settled that Rule 15 is chiefly concerned with ensuring (i) that there is a factual nexus between the amendments and the prior pleading, and (ii) that a defendant had sufficient notice of these new claims such that he will not suffer prejudice if the amendments are found to relate back." *Vitullo v. Mancini*, 684 F.Supp.2d 747, 754 (E.D.Va. 2010).

The amendment of the complaint to add Vinele and DeLisia would present facts on all fours with the facts already alleged, as their addition does not change the operative facts of this case in any way. Their addition to the case can only be expected to affect the calculation and distribution of any damages resulting from the wrongful death action.

As for prejudice, there is not any indication or suggestion from the Government that it would suffer prejudice from the addition of these two parties. Moreover, the Government has long been on notice of the existence of their claims. Not only did Vinele and DeLisia participate in the underlying administrative claim, but the complaint and its attached materials make it clear that the daughters' interests are at

stake. Finally, the Maryland Wrongful Death Act itself should have provided notice that the daughters would be plaintiffs because of its requirement that all beneficiaries be involved. *See, e.g.*, *Williams v. United States*, 405 F.2d 234, 238-39 (5th Cir. 1968) ("[I]t is plain that the government had fair notice. First, the occurrence as an operational set of facts was stated fully. . . . Next, the complaint, read with required liberality . . . clearly revealed the existence of (a) a m[i]nor (b) the mother as parent and (c) the assertion by her of a claim. Since liability to the minor would give rise to a liability to the parent under local law, and since the circumstances of these individuals was such as would reasonably indicate a likelihood that the parent would incur losses of a recoverable kind, the Government was put on notice that the parent's claim was also involved."). Vinele and DeLisia's wrongful death claims have not been "abandoned" and will relate back to the original filing date of this action, March 30, 2010.

## IV. Conclusion

For the foregoing reasons, the Government's motion, construed as a motion for summary judgment, will be granted in part and denied in part. A separate order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge