IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANGELE L. CHANG-WILLIAMS,
  et al.

    v.               :    Civil Action No. DKC 10-0783

UNITED STATES OF AMERICA

## MEMORANDUM OPINION

Presently pending in this case arising under the Federal Tort Claims Act ("FTCA") is the motion for summary judgment filed by Defendant the United States of America ("the Government"). (ECF No. 66). The issues are fully briefed, and the court now rules, no hearing being deemed necessary. *See* Local Rule 105.6. For the reasons that follow, the motion will be denied.

## I.  Background

### A.  Factual Background

Except as otherwise noted, the following facts are undisputed. On the night of Friday, November 1, 2002, the Prince George's County Police Department responded to a report of domestic violence at 833 Worley Drive in Landover, Maryland. (ECF No. 66-11, at 2). The police took Estabon Eugene, Jr., into custody and charged him with second degree assault of his

wife, Nakeisha Eugene. (*Id.* at 1). An ambulance transported Nakeisha to Andrews Air Force Base, and she was later transferred to Walter Reed Hospital.

At the time of this domestic dispute, Estabon Eugene served as a sergeant with the United States Marine Corps and was stationed at Henderson Hall in Arlington, Virginia. Sgt. Eugene worked as a watch officer at a "local control center" for the Marine Corps' Defense Messaging System. With respect to Sgt. Eugene's day-to-day work, Staff Sergeant Fernando Steverson served as his first-line supervisor, and Gunnery Sergeant Harold Holden as his second-line supervisor. (ECF No. 66-3, Holden Dep., at 11-14). Gy. Sgt. Holden reported to Master Sergeant Bruce Witherspoon, who, in turn, reported to then-Captain James Richards. (*Id.* at 11, 38). Captain Richards reported to then-Major Stephen Crow, who reported to Lt. Col. Allen Katzberg. (ECF No. 66-5, Crow Decl. ¶ 3; ECF No. 66-6, Katzberg Decl. ¶ 3). Each of these "operational" supervisors had the ability to make recommendations about disciplinary measures to be taken against Sgt. Eugene. (*See* ECF No. 66-4, Richards Dep., at 21-22). According to the Government, however, only those officers with "command authority" – specifically, those officers in "Battalion Command" – had the ability to impose disciplinary measures. (*See, e.g.*, ECF No. 66-4, Richards Dep., at 21; ECF

No. 66-8, Reed Decl. ¶ 4). As of November 2002, only Col. J.M. Reed, the Battalion Commander, had the authority to restrict Sgt. Eugene to base. (*Id.*).

On Saturday, November 2, 2002, Master Sgt. Witherspoon secured Sgt. Eugene's release by posting bail. (*See* ECF No. 66-12). Master Sgt. Witherspoon took Sgt. Eugene to the office of First Sgt. Paul Broadnax, who served as part of Col. Reed's Battalion Command staff. Rather than allowing Sgt. Eugene to return to the residence he shared with Nakeisha, Sgt. Broadnax arranged for Sgt. Eugene to be "[p]ut . . . back to the barracks" at Henderson Hall and "g[a]ve him a room until the first workday," at which point the situation would be assessed by Battalion Command. (ECF No. 66-9, Broadnax Dep., at 40-41). Sgt. Broadnax testified that, during this "short duration of time" before the first workday of Monday, November 4, Sgt. Eugene was not free to leave the barracks as a "precautionary measure." (*Id.* at 74). The Government's Fed.R.Civ.P. 30(b)(6) designee, however, testified that Sgt. Eugene was never restricted to base or otherwise precluded from going back to his residence. (ECF No. 66-2, Greer Dep., at 36-37).

Also on Saturday, November 2, Sgt. Steverson and Sgt. Ford, another Marine Corps officer, visited Nakeisha at Walter Reed Hospital. (ECF No. 66-15, Angele Dep., at 45). The officers

spoke with two of Nakeisha's aunts, Plaintiff Angele Chang-Williams and non-party Ursula Charley. (*Id.* at 59). During this conversation, one of the officers represented that Sgt. Eugene would not be able to stay in the Eugene house but would "have to go back to the barracks." (*Id.*). Based on this statement, Angele believed that Sgt. Eugene was in the barracks at Henderson Hall for the rest of the weekend. (*Id.* at 72-73). After being discharged from the hospital later in the day on November 2, Nakeisha went to stay at Ursula's house in Prince George's County, Maryland.

On Monday, November 4, 2002, Captain Richards attempted to visit Nakeisha at the hospital after seeing a photograph of her injuries. (ECF No. 66-4, Richards Dep., at 44). When he discovered that Nakeisha had already been discharged, Captain Richards briefed Lt. Col. Katzberg, his supervisor, about the extent of Nakeisha's injuries and stated that "I need to go check on her." (*Id.* at 44-45). Captain Richards testified that his motivation in visiting Nakeisha was to "console her, and see how she was doing and if there was anything I could [do to] help her." (*Id.*). At that time, Captain Richards also told Lt. Col. Katzberg that Sgt. Eugene should "be placed on restricted disciplinary action" because "it was unsatisfactory for any woman to take injuries like that." (*Id.* at 18-19). In fact,

"to [Captain Richards's] understanding, [Sgt. Eugene] already was [on restriction]." (*Id.* at 18).

Later that day, Captain Richards and Gy. Sgt. Holden visited Nakeisha at her Aunt Ursula's house in Maryland. (ECF No. 66-3, Holden Dep., at 17). Like Captain Richards, Gy. Sgt. Holden testified that the purpose of their visit was "purely sympathetic" and that they wanted to "just go there just to show that we [] were sorry." (*Id.*). In addition to Nakeisha and Ursula, Nakeisha's mother, Carolyn Rhea, and her sister, Shelita Simmons, also were present.

The details of the visit are in dispute. Nakeisha recalls telling the officers that she feared for her safety and the safety of her family, which included her daughter, mother, and sister; the Charley family; and the Chang family. (ECF No. 66-16, Nakeisha Dep., at 41). Nakeisha remembers telling the officers that she believed Sgt. Eugene "was real angry" and that "in [her] heart, [she] knew he was going to do anything to try to get to [her], no matter who it meant having to hurt." (*Id.* at 42). Carolyn recalls that both she and Nakeisha asked the officers "for protection" for Nakeisha and her family. (ECF No. 66-17, Carolyn Dep., at 35). Nakeisha and Carolyn also both remember specifically mentioning the names of members of the Chang and Charley families in the request for protection because

Sgt. Eugene knew that Nakeisha had turned to them in the past for help. (*Id.* at 35-37; ECF No. 66-16, Nakeisha Dep., at 41). Nakeisha, Carolyn, and Shelita each aver that, in response to these requests, Captain Richards and Gy. Sgt. Holden assured them (1) that Sgt. Eugene would be "detained" or "restricted" to base; and (2) that, if Sgt. Eugene needed to leave the base, he would be "monitored" or "escorted" by another Marine. (ECF No. 66-16, Nakeisha Dep., at 42; ECF No. 66-17, Carolyn Dep., at 29; ECF No. 66-18, Shelita Dep., at 22). Based on these assurances, Nakeisha "felt that [there] was going to be some security for the Charley family and the Chang family." (ECF No. 66-16, Nakeisha Dep., at 44).

Gy. Sgt. Holden and Captain Richards both deny ever making any promises of protection to Nakeisha or her family. (ECF No. 66-3, Holden Dep., at 20; ECF No. 66-4, Richards Dep., at 67). Gy. Sgt. Holden specifically denies making any promises that Sgt. Eugene would be restricted to base or that he would be escorted by a Marine off-base, and further testified that it would have been "out of [their] authority" to do so because only Battalion Command could impose such measures. (ECF No. 66-3, Holden Dep., at 21). Although Captain Richards does not specifically recall that anyone asked about what "was being done" to Sgt. Eugene, he avers that he "wouldn't have had any

answers for them" because, at that point, he did not know for sure if Sgt. Eugene was actually being restricted to Henderson Hall. (ECF No. 66-4, Richards Dep. at 62-63). Captain Richards was aware, however, that "[t]here was hearsay from over the weekend that [Sgt. Eugene] was going to be taken to the barracks and put on restriction over the weekend until Monday." (*Id.* at 53). Captain Richards also admits that, at the time of the visit to the Charley residence, he assumed that Nakeisha would not be able to return to Sgt. Eugene because he "was going to be on restriction." (*Id.* at 61; *see also id.* at 18-19).

After their visit to the Charley residence, Captain Richards returned to Henderson Hall and again briefed his supervisor, Lt. Col. Katzberg, about the extent of Nakeisha's injuries. (ECF No. 66-4, Richards Dep., at 63). He also again recommended that disciplinary action be taken against Sgt. Eugene and, specifically, that Sgt. Eugene be placed on restriction. (*Id.* at 44). Captain Richards's supervisors later told him that "command will take it from here," at which point "there [was] nothing else [he] personally could have done." (*Id.*). Lt. Col. Katzberg avers that neither Captain Richards nor Gy. Sgt. Holden ever told him that "they had made any promises to the spouses of Sgt. Eugene or to any other persons." (ECF No. 66-6, Katzberg Decl. ¶ 5). Had they done so, Lt. Col.

Katzberg avers that he "would have chewed them out, and immediately contacted the command to take corrective action, because neither Richards nor Holden, nor the Marine Corps, had the authority to make promises of protection to civilians living in town off-base." (*Id.*).

Also on Monday, November 4, Ursula called Angele to tell her about the visit by Captain Richards and Gy. Sgt. Holden. (ECF No. 66-15, Angele Dep., at 73). Ursula told Angele that she and Nakeisha had expressed their fear that "if Sgt. Eugene came looking for Nakeisha, the first house he was going to come to is the Chang family house." (*Id.* at 75). According to Angele, Ursula told her that "the Chang family, any of the Charley family, Nakeisha and [her minor daughter] and Shelita, they didn't have to worry about that because [the officers] promised that [Sgt.] Eugene would be detained and monitored on the base in the barracks at Henderson Hall." (*Id.* at 76). Angele, in turn, relayed the details of her conversation with Ursula to Kelvin, her husband, and Aldwin, her son, both of whom lived with her. (*Id.* at 88-89). Angele testifies that the assurances extended by the officers were a "relief because I believed if that's what the military is going to do, I didn't have to be worrying about somebody lurking around my house

because [Sgt. Eugene] would be on the military base." (*Id.* at 89). Thus, Angele "went about [her] daily life." (*Id.* at 90).

On Tuesday, November 5, Col. Reed, the head of Battalion Command, issued a military protection order ("MPO") against Sgt. Eugene. (ECF No. 66-19). The MPO ordered Sgt. Eugene to stay away from Nakeisha, but did not reference any other family members. (*Id.*). Other than the MPO, Battalion Command did not impose any disciplinary measures on Sgt. Eugene. (ECF No. 66-8, Reed Decl. ¶¶ 6-8). Specifically, Battalion Command did not place Sgt. Eugene on restriction or order that he be escorted when he left Henderson Hall. (*Id.*). Nor did Battalion Command take any steps to ensure that Sgt. Eugene was abiding by the MPO. (*Id.*). Rather, Sgt. Eugene was free to come and go from Henderson Hall as he pleased, with the MPO serving only as a "moral order" that Sgt. Eugene "was expected to follow." (*Id.* ¶ 8). Col. Reed avers that he had discretion to place Sgt. Eugene on restriction or to recommend that court martial charges be brought against him, which could result in him being subjected to a military escort. (*Id.* ¶ 8). In determining what disciplinary measures to impose, Col. Reed generally considers a variety of factors, including "the severity of the infraction, past misconduct history, past service record, and the needs of the Marine Corps in discharging its functions." (*Id.* ¶ 5). In

9

Sgt. Eugene's case, Col. Reed did not believe that restriction or court-martial charges were appropriate because, to his knowledge, Sgt. Eugene had not previously engaged in misconduct and had a good service record. (*Id.* ¶ 6).

Also on November 5, Plaintiff DeLisia Carpenter (the daughter of Angele and a cousin of Nakeisha) discovered that her tires had been slashed. (ECF No. 66-14, DeLisia Dep., at 57). Because she suspected that Sgt. Eugene might be responsible, DeLisia called Gy. Sgt. Holden to inquire about Sgt. Eugene's whereabouts. (*Id.* at 58). According to DeLisia, Gy. Sgt. Holden reported that Sgt. Eugene had been "unaccounted for" for nine hours. (*Id.* at 59). DeLisia asked whether Sgt. Eugene would be "unaccounted for" in the future, and Gy. Sgt. Holden responded that "[n]o, that's not tolerated" and stated that the Marine Corps "will make sure that he will be monitored." (*Id.* at 61). Thus, in DeLisia's view, her phone call with Gy. Sgt. Holden reaffirmed that "the promise of protection from [the visit of November] 4th was still in place." (*Id.*). DeLisia shared the details of this conversation with Angele and Nakeisha. (*Id.* at 59).

On Wednesday, November 6, Nakeisha petitioned the District Court of Maryland for Prince George's County, Maryland, for a civil protective order ("CPO"). (*See* ECF No. 66-20). Nakeisha

sought protection for herself and several members of her family, including Angele, DeLisia, Ursula, and unspecified members of Ursula's family. (*Id.* at 5). Nakeisha testified that she obtained the CPO to ensure that Sgt. Eugene knew that she "didn't want to be bothered with him" and that she "did not want him around the Charleys, the Changs, []or [her]self," because – although it was possible that Captain Richards and Gy. Sgt. Holden had expressed her feelings to Sgt. Eugene – she wanted to be sure he got the message. (ECF No. 66-16, Nakeisha Dep., at 57, 59, 63).

On Friday, November 8, Nakeisha learned from Captain Richards that that the Marine Corps could not restrict Sgt. Eugene to base on the weekends. (*See* ECF No. 66-16, Nakeisha Dep., at 84-86). Nakeisha relayed this information to Angele. (ECF No. 66-15, Angele Dep., at 92). According to Angele, Nakeisha later called back to say that she had spoken with Captain Richards, who reassured Nakeisha that the Marines would restrict Sgt. Eugene to Henderson Hall during the week. (*See id.*).

On Tuesday, November 12, Sgt. Eugene drove a rental car to the Chang residence in Capitol Heights, Maryland, and forcibly entered the house, looking for Nakeisha. When he learned that she was not present, Sgt. Eugene shot Angele, Kelvin, and Aldwin

Chang. Kelvin and Aldwin suffered fatal wounds, while Angele survived. After making another stop at the Charley residence, Sgt. Eugene led local police on a high-speed chase that ended when he crashed his car on the Capital Beltway. Sgt. Eugene then shot himself in the head and later died.

**B. Procedural Background**

Angele Chang (now Angele Chang-Williams) and her two daughters, DeLisia Carpenter and Vinele Chang, filed an administrative claim for wrongful death and injury with the Naval Legal Service Office on November 12, 2004. (ECF Nos. 66-29). The "shootings and murders committed by Marine Corps Sgt. Est[a]bon Eugene" formed the basis of the claims. (*Id.* at 1). Almost five years later, on September 29, 2009, the Department of the Navy denied the claims. (ECF No. 66-31, at 1-2). The denial letter stated that "[i]f you do not agree with this decision, be advised that you have six months from the date of mailing of this letter to file suit in the appropriate federal district court." (*Id.* at 2). On March 30, 2010, Angele filed a *pro se* complaint in this court, asserting various tort claims under the FTCA in her name only. (ECF No. 1). On August 11, 2010, the Government moved to dismiss or, alternatively, for summary judgment. (ECF No. 10).

In a Memorandum Opinion and Order issued on February 2, 2011, the court granted the Government's motion in part and denied it in part. (ECF Nos. 16 & 17).[1] First, the court held that the United States could not be held directly liable for Sgt. Eugene's actions based on a theory of *respondeat superior*. (ECF No. 16, at 14). By contrast, the court held that the Government could be held liable for the alleged negligence of the Marine Corps in promising to take certain actions to protect the Chang family and then failing to do so. (*Id.*). The court concluded that such claims were not barred by either the intentional tort exception or the discretionary function exception to the United States' waiver of sovereign immunity established by the FTCA. (*Id.* at 15-32). Next, the court held that fact issues remained as to whether a special relationship existed between Angele and the Marine Corps that would allow the Government to be held liable for her personal injuries under Maryland tort law. (*Id.* at 32-54). Finally, the court dismissed Angele's wrongful death claim as to her husband for failure to join certain necessary parties and directed her to

---

[1] Because the United States is the only proper Defendant in an FTCA action, the court dismissed the other entities named in Ms. Chang-Williams's original complaint: the Department of the Navy, "JAG," and the Marine Corps. (ECF No. 16, at 2).

file a new, amended complaint that added Kelvin's two daughters as plaintiffs. (*Id.* at 54-61).

On February 22, 2011, Angele – through newly retained counsel – filed an amended complaint that adds as Plaintiffs Vinele Chang (Kelvin's daughter); DeLisia Carpenter (Kelvin's daughter); and Isla Elaine Washington (Kelvin's mother). (ECF No. 19). The amended complaint asserts two wrongful death counts as well as a count relating to Angele's personal injuries, all of which are premised on the Government's alleged "negligent failure to protect." (*See id.*). Following discovery, the Government again moved for summary judgment. (ECF No. 66). Plaintiffs filed an opposition (ECF No. 67), and the Government replied (ECF No. 68).

## II. Standard of Review

Summary judgment may be entered only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

14

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). At the same time, the facts that are presented must be construed in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

## III. Analysis

The Government offers four arguments as to why it is entitled to judgment as a matter of law. (ECF No. 66-1, at 23-50). First, the Government contends that Plaintiffs' claims depend entirely on the allegedly false assurances of Captain Richards and Gy. Sgt. Holden and therefore fall within the misrepresentation exception to the FTCA, depriving the court of subject matter jurisdiction. Second, the Government argues that, even crediting Plaintiffs' version of events, the officers

15

were not acting within the scope of their employment at the time of the alleged assurances and therefore their conduct is not actionable under the FTCA.  Third, the Government asserts that the evidence adduced during discovery establishes that no special relationship existed between Plaintiffs and the Marine Corps that would provide a basis for recovery under Maryland tort law.  Fourth, the Government contends that any breach of the alleged promises could not have proximately caused Plaintiffs' injuries, which were brought about by the unforeseen and extraordinary actions of Sgt. Eugene.

The Government also raises two other arguments that, if successful, would warrant partial summary judgment in its favor. First, the Government argues that Plaintiffs' wrongful death claims are time-barred.  Second, the Government argues that any claims asserted by Isla Washington, Vinele Chang, and DeLisia Carpenter must be dismissed for failing to satisfy the FTCA's jurisdictional prerequisites.  Each of these arguments will be addressed, in turn.

A.    **The Misrepresentation Exception to the FTCA's Waiver of Sovereign Immunity Does Not Apply.**

As explained in the previous Memorandum Opinion, the United States cannot be sued absent an explicit waiver of its sovereign immunity.  *United States v. Sherwood*, 312 U.S. 584, 587 (1941).

The FTCA is one such waiver, which allows the Government to be sued in federal district court for injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). Where immunity is waived, the Government may be held liable in tort "in the same manner and to the same extent as a private individual under like circumstances." *Id.* § 2674. But the waiver of sovereign immunity established by the FTCA is narrow in scope, *see Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 841 (4th Cir. 1990), and is qualified by a number of express exceptions, *see* 28 U.S.C. § 2680. Relevant here, the FTCA's waiver of immunity "shall not apply to . . . [a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, *misrepresentation*, deceit, or interference with contract rights." *Id.* § 2680(h) (emphasis added).

According to the Government, the misrepresentation exception established in Section 2680(h) bars Plaintiffs' claims. (ECF No. 66-1, at 23-27).[2] Specifically, the Government

---

[2] The Government did not raise the misrepresentation exception in its initial motion to dismiss or for summary judgment. Despite the late stage of the proceedings, the

17

contends that controlling precedent establishes a "but for" test for determining whether the exception is triggered: if a plaintiff's negligence action cannot exist but for the communication of false information by a Government employee, her claims are excepted by Section 2680(h), regardless of how they are labeled. (*Id.* at 24). Applied here, the Government asserts that Plaintiffs' action depends entirely on the assurances allegedly made by Major Richards and Gy. Sgt. Holden and that these assurances were false because they: (1) misrepresented the authority of the officers, who lacked the ability to impose the promised disciplinary measures; and (2) ultimately proved to be inaccurate as a factual matter given that the Marine Corps never restricted Sgt. Eugene or required that he be accompanied by an escort off-base. (*Id.* at 26-27). Plaintiffs respond by arguing that their claims do not arise out of a breach of the duty to use due care in communicating information, but instead derive from the Government's negligent failure to fulfill its duty to protect, which it incurred by promising that Sgt. Eugene would be restricted and monitored. (ECF No. 67, at 22-23). Plaintiffs' position is persuasive.

Government's argument must be addressed as the issue implicates subject matter jurisdiction. *See* Fed.R.Civ.P. 12(h)(3) (an action must be dismissed "[i]f the court determines at any time that it lacks subject-matter jurisdiction").

The United States Supreme Court has addressed the misrepresentation exception on two occasions. In *United States v. Neustadt*, 366 U.S. 696 (1961), a couple agreed to pay $24,000 for a home that had been appraised for $22,750 by the Federal Housing Administration ("FHA"), based on the agency's home inspection. *Id.* at 698. After closing, the couple discovered that the house was worth much less because of a defective condition in the subsoil – a condition that could have been discovered upon a proper inspection. *Id.* at 700. The couple sued the Government under the FTCA, alleging that they would not have purchased the property for $24,000 but for the FHA's negligence in conducting the inspection and preparing the appraisal. *Id.* at 701. The Fourth Circuit held that the misrepresentation exception did not apply, reasoning that the gravamen of the plaintiffs' action was that the FHA negligently performed its duty to make a careful appraisal and that any misrepresentation was "merely incidental" to this theory of liability. *Id.* at 704. The Supreme Court reversed. First, the Court held that the misrepresentation exception encompasses those claims that fall within "the traditional and commonly understood legal definition of the tort of 'negligent misrepresentation,'" in addition to claims for intentional or willful misrepresentation. *Id.* at 702. Second, the Court held

19

that the plaintiffs' losses were caused by the Government's alleged breach of its "duty to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely," rather than the breach of any separate, distinct statutory duty to perform an accurate appraisal. *Id.* at 708-09. Thus, Section 2680(h) barred the plaintiffs' claim.

Twenty years later, the Supreme Court revisited the misrepresentation exception in *Block v. Neal*, 460 U.S. 289 (1983). In *Neal*, the plaintiff commissioned the construction of a house after entering into an agreement with the Farmers Home Administration ("FmHA") wherein the agency agreed to provide a loan for the house upon completion. The agreement required the builder to conform to FmHA-approved plans and also granted the FmHA a right to inspect all materials and workmanship. An FmHA official inspected the house on three occasions, and his reports "contained no adverse comments on the construction work." *Id.* at 292. Upon move-in, however, the plaintiff discovered fourteen defects. When the FmHA refused to pay for the corrections, the plaintiff sued under the FTCA. The Sixth Circuit held that the complaint stated a claim for negligence (and thus was not barred by the misrepresentation exception) based on the principle that "one who undertakes to act, even though gratuitously, is required to act carefully and with the

exercise of due care and will be liable for injuries proximately caused by failure to use such care." *Id.* at 293 (internal quotation marks omitted). The Supreme Court affirmed, distinguishing *Neustadt* as a case where "the gravamen of the action . . . was that the plaintiff was misled by a 'Statement of FHA Appraisal' prepared by the government"; in other words, a case where "the alleged conduct that was the basis of [the plaintiff's] negligence claim was in essence a negligent misrepresentation." *Id.* at 296-97. In *Neal*, by contrast, the Court concluded that the Government's misstatements in its reports were "not essential" to the plaintiff's negligence claim because the FmHA had voluntarily incurred a "duty to use due care to ensure that the builder adhere to previously approved plans and cure all defects before completing construction" – a duty that is "*distinct* from any duty to use due care in communicating information to [the homebuyers]." *Id.* at 297 (emphasis added). That the plaintiff could have also brought a negligent misrepresentation claim absent Section 2680(h) was irrelevant because "[n]either the language nor history of the [FTCA] suggest that when one aspect of the Government's conduct is not actionable under the 'misrepresentation' exception, a claimant is barred from pursuing a distinct claim arising out of other aspects of the Government's conduct." *Id.* at 298.

The Fourth Circuit synthesized *Neustadt* and *Neal* in *Carolinas Cotton Growers Ass'n, Inc. v. United States*, 785 F.2d 1195, 1199 (4th Cir. 1986). There, a cooperative association of cotton growers requested that the U.S. Department of Agriculture "grade" certain cotton crops to determine their value based on prices established by the National Cotton Exchange. Based on the grade communicated by the Government, the cooperative purchased the crops from individual growers at the corresponding exchange price and then attempted to re-sell the cotton to users of raw cotton. When the end users determined that the Government had over-graded the cotton and refused to pay the higher price, the cooperative sued the Government to recover its losses. The complaint asserted a claim for the negligent determination of the proper cotton grade and a second claim for communicating a misrepresentation. The Fourth Circuit held that the facts presented were more analogous to *Neustadt* than *Neal* and that both claims were barred by Section 2680(h) because "[i]t seems inescapable that had no communication of grade been made by the government's agents to the [plaintiff], there would have been no basis for any claim." *Id.* Put differently, the cooperative "suffered losses because of the [Government's] misrepresentation of the grade of cotton" and there was

"[n]o . . . separate duty, whether voluntary or otherwise, . . . to be found" in the allegations of the complaint. *Id.*

At first blush, the Government's application of this precedent to the facts here appears convincing: but for the assurances allegedly made by Captain Richards and Gy. Sgt. Holden, Plaintiffs would have no cause of action against the Government because, absent the officers' assurances, the Marine Corps owed no duty to protect the Chang family. The problem, however, lies in the Government's assumption that the alleged assurances are the type of false statements that give rise to a misrepresentation claim under Maryland law. In actuality, the alleged assurances are the type of promises that can give rise to a special relationship under Maryland law, pursuant to which the promisor incurs a separate and distinct duty to protect another. (*See generally* ECF No. 16, at 32-54 (discussing the "special relationship" exception to the general principle that there is no duty to protect a victim from the criminal acts of a third person)).

In both *Neustadt* and *Neal*, the Supreme Court observed that "[t]he 'misrepresentation' exception applies only when the action itself falls within the commonly understood definition of a misrepresentation claim." *Neal*, 460 U.S. at 296, n.5 (citing

*Neustadt*, 366 U.S. at 711, n.26).  In Maryland,[3] it is well-established that promissory or predictive statements are not actionable as either intentional or negligent misrepresentations absent a showing that the promise was "made with the present intention not to perform" or that the prediction was made "with present knowledge that the predicted event will not occur." *Jones v. Koons Auto., Inc.*, 752 F.Supp.2d 670, 687 (D.Md. 2010) (citing *Miller v. Fairchild Indus., Inc.*, 97 Md.App. 324, 326 (1993)).

Here, Plaintiffs have never alleged that the Marine Corps officers harbored any fraudulent intent when they offered assurances that certain disciplinary measures would be taken against Sgt. Eugene.  Nor is there anything in the record that would support such a conclusion.  Rather, Plaintiffs present evidence from which a reasonable fact-finder could conclude that the officers offered these assurances with the expectation that the Marine Corps would take such disciplinary actions and then failed to notify Plaintiffs when the measures were not, in fact,

---

[33] As explained in the court's prior Memorandum Opinion, the FTCA only provides jurisdiction, not the substantive cause of action.  (ECF No. 16, at 32-33).  Thus, "an action under [the] FTCA exists only if the State in which the alleged misconduct occurred would permit a cause of action for that misconduct to go forward." *Carlson v. Green*, 446 U.S. 14, 23 (1980).  Here, Maryland law applies to determine the potential tort liability of the United States.  (*See* ECF No. 16, at 33-34).

imposed – a theory of liability that simply does not fit within the bounds of a misrepresentation claim, despite the Government's efforts to do so.[4] Under Plaintiffs' version of events, the relevant theory of liability is the "special relationship" exception discussed at length in the court's prior Memorandum Opinion (*i.e.*, that, by making a gratuitous yet specific promise of protection to another that induces the other's reasonable reliance, the promisor incurs a duty to protect). Thus, unlike *Neustadt* and *Carolina Growers*, there is a distinct tort duty – separate and apart from the duty to use due care in communicating information – to be found if Plaintiffs' version of events is credited.

---

[4] As to the Government's argument that the alleged assurances were necessarily "false" because neither Captain Richards or Gy. Sgt. Holden had command authority, the record does not indicate that the officers made any express representations that they personally would impose the disciplinary measures on Sgt. Eugene. For example, Nakeisha does not recall that either officer made any statements regarding whether they personally had "command authority" to impose disciplinary measures. (ECF No. 66-16, Nakeisha Dep., at 50). Likewise, although Carolyn and Shelita both aver that they *believed* Captain Richards had the power to make good on his promises, neither could recall any specific representations by the officers about their authority, command or otherwise. (ECF No. 66-17, Carolyn Dep., at 46-47; ECF No. 66-18, Shelita Dep., at 26-27). Thus, the Government's second theory of "falsity" boils down to an alternative way to argue that Captain Richards and Gy. Sgt. Holden were acting outside of the scope of their employment when they made the alleged promises. For reasons discussed below, genuine issues of material fact require the scope-of-employment issue to be decided by a fact-finder.

The two cases relied on by the Government do not require a different result. In the pre-*Neal* case of *Reamer v. United States*, 459 F.2d 709 (4th Cir. 1972), a law student signed an enlistment contract with the Army to avoid having the draft interrupt his fall semester. *Id.* at 710. The Army's recruiting officers assured the student that, if he signed the contract, he would not have to report for duty before February 1, 1969 (*i.e.*, after the semester ended). Despite this assurance (which was also reflected in the terms of the enlistment contract), the Army instructed the law student to report for duty on December 2, 1968, forcing him to leave school and forfeit his fall tuition money. The student sued the Government. In the alternative to his contract claims, the student asserted a misrepresentation claim, alleging that the recruiting officers had falsely represented their authority to bind the United States and that they made representations about his date of call with the intent to defraud. The district court granted the Government's motion to dismiss because the complaint presented a contract action that was not actionable under the FTCA. On appeal, the Fourth Circuit affirmed on this ground. Then, the *Reamer* court went on to observe that "[a]ctually, whether the plaintiff has declared in contract or tort is of no consequence." *Id.* To the extent the plaintiff sought recovery

in tort, the Fourth Circuit opined that his case would be barred by the FTCA's misrepresentation exception because of the allegations that the plaintiff had enlisted based "on the promise of a February 1969 or later induction" that was later "denied him." *Id.* at 711. The *Reamer* court observed that, "[w]hether negligent or wil[l]ful, no recovery can be had under the [FTCA] for this misrepresentation or deceit." *Id.* (citing *Neustadt*, 366 U.S. at 696).

Although this sentence arguably suggests that any claim premised on a broken promise is excepted by Section 2680(h), *Reamer* cannot be read so broadly. First, the Fourth Circuit discussed subject matter jurisdiction under the FTCA only as an alternative ground for affirmance, and therefore its entire discussion of the misrepresentation exception is arguably *dicta*. Second, the *Reamer* court did not actually look to substantive principles of state law to examine whether the officers' conduct would be actionable as a misrepresentation. Third, unlike the assurances alleged here, the promise at issue in *Reamer* is not the type of promise that could give rise to a special relationship and a corresponding duty to protect under substantive principles of Maryland tort law.

This court's decision in *Piechowicz v. United States*, 685 F.Supp. 486, 488 (D.Md. 1988), is inapposite for similar

27

reasons.   There, a husband and wife who were scheduled to testify at a criminal trial received threats from the accused. The Assistant United States Attorney and the FBI Special Agent assigned to the case told the couple "not to worry about the threats" and advised them "to testify truthfully and honestly." *Id.*   The husband later died in a "gangland style" shooting, and his surviving family members sued the Government under the FTCA. *Id.* at 489.   The principal issue at the summary judgment stage was whether the discretionary function exception applied.   In a footnote, however, Judge Kaufman observed that some of the plaintiffs' allegations could "fairly be construed as presenting a claim for misrepresentation; that is, that the United States misled [the couple] about the dangers of testifying by telling them not to worry about [the accused's] threats against them, and that [the couple] relied upon those misrepresentations." *Id.* at 494, n.18.   The *Piechowicz* court therefore *sua sponte* held that it lacked jurisdiction over any claim for misrepresentation.   *Id.*

Although seemingly analogous, *Piechowicz* is distinguishable in a critical respect.   There, the plaintiffs did not request protection from the Government, and the Government agents did not offer or promise protection.   *See id.* at 488-89.   Here, by contrast, the Marine Corps officers did not simply tell Nakeisha

and her family not to worry but instead – in response to their requests for protection – allegedly made specific assurances about the disciplinary measures that would be taken against Sgt. Eugene. This difference is critical because, as discussed in the court's prior Memorandum Opinion and again below in Section III.C, the fact-finder could ultimately conclude that the alleged assurances made by the Marine Corps officers gave rise to a special relationship and a corresponding duty to protect – both of which were absent in *Piechowicz*.

In sum, the Government's attempt to cabin Plaintiffs' claims into Section 2680(h) is unavailing because the allegations would not give rise to a misrepresentation claim under Maryland law; rather, the gravamen of the action turns on the alleged breach of the Marine Corps' duty to protect.

**B.  Disputed Issues of Fact Remain as to Whether the Officers Were Acting Within the Scope of Their Employment at the Time of the Alleged Promises.**

The Government next argues that there is no subject matter jurisdiction under the FTCA because Captain Richards and Gy. Sgt. Holden could not have been acting within the scope of their employment at the time they purportedly made the assurances at the Charley residence. (ECF No. 66-1, at 28-35; ECF No. 68, at 9-15). Specifically, the Government contends that: (1) the officers lacked "command authority" to decide what disciplinary

measures would be taken against Sgt. Eugene; (2) the officers'
alleged actions at the Charley residence were not in furtherance
of any legitimate Marine Corps business but were instead
personally motivated by sympathy; (3) the purported assurances
were wholly divorced from the officers' normal duties and
promised a kind of action (*i.e.*, providing law enforcement-like
protection for off-base civilians) that the Marine Corps does
not typically undertake; (4) acting to fulfill the alleged
promises would have violated the Posse Comitatus Act, 18 U.S.C.
§ 1385; and (5) the alleged assurances were "extravagant" and
"unforeseeable."  Despite the Government's many arguments, the
current record demands that a fact-finder decide whether the
officers were acting within the scope of their employment.

Under the FTCA, subject matter jurisdiction is proper only
when the Government employee in question is "acting within the
scope of his office or employment."  28 U.S.C. § 2679(b)(1).  In
Maryland, there are "few, if any, absolutes" in assessing
whether an employee's act is within the scope of employment.
*Sawyer v. Humphries*, 322 Md. 247, 255 (1991).[5]  The general rule
is that, "[f]or an employee's tortious acts to be considered

_____

[5] In FTCA cases, federal courts look to the "law of the
state in which the tort occurred" to decide the scope of
employment issue.  *Maron v. United States*, 126 F.3d 317, 324 (4th
Cir. 1997).

30

within the scope of employment, the acts must have been in furtherance of the employer's business and authorized by the employer." *So. Mgmt. Co. v. Taha*, 378 Md. 461, 481 (2003). "By 'authorized' [it] is not meant authority expressly conferred [by the employer], but whether the act was such as was incident to the performance of the duties entrusted to the employee by the employer, *even [if] in opposition to his express and positive orders.*" *Sawyer*, 322 Md. at 255 (emphasis added) (citations and some internal quotation marks omitted). "Accordingly, 'an act may be within the scope of employment, even though forbidden or done in a forbidden manner . . . .'" *Tall v. Bd. of Sch. Comm'r of Balt. City*, 120 Md. App. 236, 252 (1998) (quoting *Great Atl. & Pac. Tea Co. v. Noppenberger*, 171 Md. 378, 391 (1937)).

Yet "where an employee's actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests," the actions will ordinarily be considered outside the scope of employment. *Sawyer*, 322 Md. at 256–57. Moreover, "'[w]here the conduct of the servant is unprovoked, highly unusual, and quite outrageous,' courts tend to hold 'that this in itself is sufficient to indicate that the motive was a purely personal one' and the conduct outside the scope of employment." *Id.* at 257 (citation omitted). Thus, "an

important factor is whether the employee's conduct was 'expectable' or 'foreseeable'" to the employer. *Id.* at 256 (quoting *Cox v. Prince George's Cnty.*, 296 Md. 162, 171 (1983)).

In *Noppenberger,* the Court of Appeals of Maryland enumerated a list of factors to consider when analyzing whether an employee acted within the scope of his or her employment:

> (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result, and (j) whether or not the act is seriously criminal.

*Noppenberger*, 171 Md. at 390-91 (citations and internal quotation marks omitted); *accord Sawyer*, 322 Md. at 256; *Tall*, 120 Md.App. at 253.

Given the multitude of factors to consider, "[o]rdinarily, the issue of whether a particular act is within the scope of employment is properly decided by a jury . . . . " *Barclay v.*

*Briscoe*, 427 Md. 270, 283 (2012). Only where there is "no conflict in the evidence relating to the question and but one inference can be drawn therefrom" does the issue become a "question . . . of law for the court." *Id.* (internal citation and quotation marks omitted omitted).

Here, the record allows for more than one inference as to whether Captain Richards and Gy. Sgt. Holden were acting within the scope of their employment. The Government presents ample evidence that the officers lacked "command authority" to decide what disciplinary measures would ultimately be imposed on Sgt. Eugene. (*See, e.g.*, ECF No. 66-2, Greer Dep., at 132-33 (the Marine Corps' Rule 30(b)(6) designee testifying that neither Gy. Sgt. Holden nor Captain Richards possessed command authority)). Yet there is also evidence from which a reasonable fact-finder could conclude that, although the officers were not expressly authorized to make any assurances about disciplinary measures, their actions at the Charley residence were nonetheless "incident to" the performance of their duties. Both officers were in Sgt. Eugene's operational line of supervision and visited the Charley residence in uniform, on a work day. Captain Richards also admits that he discussed the visit with his supervisor beforehand and then briefed his supervisor afterwards. On both of these occasions, Captain Richards

recommended to his supervisor that Sgt. Eugene be disciplined. Although these facts are not necessarily dispositive, *see Sawyer*, 322 Md. at 259 (explaining that "whether or not tortious conduct occurs during duty hours or the normal period of employment is only one of many considerations in determining whether the conduct is within the scope of employment"), such evidence could certainly support an inference that the officers' assurances were "incident to" their regular duties. A reasonable fact-finder could also view this evidence as negating the officers' testimony that their visit was motivated solely by personal sympathies.

The Government repeatedly emphasizes that the Marine Corps is not in the business of protecting civilians who live off-base. At bottom, this argument mischaracterizes the substance of the alleged assurances. Plaintiffs do not assert that the officers made an unconditional promise to take any and all steps to ensure protection for Nakeisha and her family on a 24-hours-a-day, 7-days-a-week basis. Rather, Plaintiffs contend that the officers made specific assurances that Sgt. Eugene would be restricted to Henderson Hall and would be accompanied by an officer if he left base. Several Marine Corps witnesses testified that it is possible to restrict a Marine to base as a form of discipline for domestic violence. Likewise, although it

is a more drastic form of discipline, the Marine Corps can also order a Marine to be escorted at all times. Col. Reed avers that one factor he considers in deciding what discipline to impose on a Marine accused of domestic violence is "the needs of the Marine Corps in discharging its functions" (ECF No. 66-8, Reed Decl. ¶ 5) – implying that, in some cases, the needs of the Marine Corps counsel in favor of restricting the Marine to base or requiring him to be escorted off-base. That such measures would also have protective benefits for the Marine's spouse or the spouse's family members does not necessarily mean that they run counter to the Marine Corps' legitimate interests.

The Government's reliance on the Posse Comitatus Act is also misplaced. Under Maryland law, the illegality of an action cuts against a finding of *respondeat superior* liability only where the action is "*seriously* criminal." *Noppenberger*, 171 Md. at 390-91 (emphasis added). Here, acting to fulfill the assurances made by Gy. Sgt. Holden and Captain Richards is far afield from the type of "seriously criminal" activity that Maryland courts view as falling outside the scope of employment. *See, e.g.*, *Sawyer*, 322 Md. at 247 (police officer acting outside of the scope of his employment when he attacked two men unrelated to any lawful traffic stop or arrest); *Wolfe v. Anne Arundel County*, 374 Md. 20, 36-37 (2003) (police officer not

acting within the scope of employment when, after effecting a lawful traffic stop, he took the driver to a parking lot and raped her); *Henley v. Prince George's Cnty.*, 305 Md. 320, 330 n.2 (1986) (carpentry instructor not acting within the scope of employment when he raped and murdered a child).

Furthermore, it is not clear that restricting Sgt. Eugene to base or escorting him off-base would violate the Posse Comitatus Act. In very general terms, the Posse Comitatus Act prohibits "military personnel from participating in civilian law enforcement activities." *United States v. Chon*, 210 F.3d 990, 993 (9th Cir. 2000) (citing 18 U.S.C. § 1385). One way to determine whether the statute has been violated is to ask whether the military's action "subject[s] the citizenry to the regulatory exercise of military power." *United States v. Bacon*, 851 F.2d 1312, 1313 (11th Cir. 1988); *see also United States v. Yunis*, 681 F.Supp. 891, 892 (D.D.C. 1988) (explaining that one test is "whether the military personnel subjected citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature"), *aff'd*, 924 F.2d 1086 (D.C.Cir. 1991). Here, fulfilling the alleged promises made by Captain Richards and Gy. Sgt. Holden would not have subjected Nakeisha or any member of her family to "regulatory, proscriptive, or compulsory" military power. Rather, it would

have subjected Sgt. Eugene, a Marine Corps officer, to such powers. The Government surely is not suggesting that the Posse Comitatus Act somehow limits the military's ability to discipline its own officers.[6]

Finally, as to foreseeability, the Government points to the testimony of several Marines that they would have been shocked to learn that Gy. Sgt. Holden and Captain Richards made a promise to protect civilians living off-base as a result of a single domestic violence incident. Once again, this argument mischaracterizes the nature of the alleged promises. Moreover, none of these witnesses testified as to what they *would* expect to transpire during an officer's visit with the spouse of a Marine who had been seriously injured in a domestic dispute. Given that Captain Richards's supervisor knew about the visit in advance, and in light of Captain Richards's testimony about the "hearsay from over the weekend that he was going to be . . . put on restriction," it is not for the court to conclude, as a

_____

[6] In its reply, the Government argues that if Sgt. Eugene had attempted to harm Nakeisha or her family at some point while he was off base, the officer escorting him would have had to disarm him and "generally act to protect the Plaintiffs from harm" – the very same duties "the State police are charged with doing." (ECF No. 68, at 14-15). This argument simply assumes too much, as it seems just as likely that the escorting officer would call local law enforcement officials at the earliest indication that Sgt. Eugene intended to inflict harm on civilians.

matter of law, that the officers' alleged assurances were so outrageous as to be unforeseeable.

In sum, a fact-finder must determine whether Captain Richards and Gy. Sgt. Holden were acting within the scope of their employment at the time of the alleged assurances.

## C. The Government's Renewed Arguments Regarding the Special Relationship Issue Must Be Rejected.

Next, the Government renews its argument that the alleged assurances did not give rise to a special relationship between the Chang family and the Marine Corps, meaning that there is no basis for holding the Government liable under substantive Maryland tort law.[7] Specifically, the Government posits that there is no evidence: (1) that Captain Richards, Gy. Sgt.

_____

[7] As explained at length in the Memorandum Opinion of February 2, 2011, a private party in Maryland generally has no duty "to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person or between the actor and the person injured." *Gourdine v. Crews*, 405 Md. 722, 746 (2008) (quoting *Ashburn v. Anne Arundel Cnty.*, 306 Md. 617, 628 (1986)); *see also Scott v. Watson*, 278 Md. 160, 166 (1976) ("[A] private person is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship."); *Warr v. JMGM Grp., LLC*, --- A.3d ----, 2013 WL 3828799, at *9 (Md. July 25, 2013) (reaffirming that "[t]he concept of special relationships . . . between the party sued and the injured party is the gravamen of our determinations of liability in third party duty cases"). The existence of a special relationship is determined on a "case-by-case basis." *McNack v. State*, 398 Md. 378, 399 (2007) (internal quotation marks omitted).

Holden, or any other member of the Marine Corps made a direct promise to the Chang family, none of whom were present at the November 4 meeting; (2) that the Marine Corps took any affirmative acts pursuant to the officers' alleged promises; or (3) that the Plaintiffs relied on the alleged promises. The court previously rejected each of these arguments (*see* ECF No. 16, at 34-54), and, contrary to the Government's arguments, the evidence adduced during discovery does not change that analysis.

### 1.  Direct Promise

The Government first contends that Plaintiffs have failed to adduce evidence that the officers made any promises to them or for their benefit, given that neither Captain Richards nor Gy. Sgt. Holden even knew of the Chang family's existence. (ECF No. 66-1, at 38-29).  As a factual matter, this argument ignores the testimony of Nakeisha and Ursula, both of whom specifically recall mentioning the Chang family to the officers in connection with their request for protection.  (*See* ECF No. 66-17, Carolyn Dep., at 35; ECF No. 66-16, Nakeisha Dep., at 41).  As a legal matter, the court previously observed that "[n]o Maryland court has demanded a 'direct' promise" to establish a special relationship; rather, the focus of the inquiry is whether "there is a relationship of dependence or conduct that spurs reasonable reliance."  (ECF No. 16, at 39 (citing *Muthukumarana v.*

*Montgomery Cnty.*, 370 Md. 447, 463 (2002)). Thus, as before, a reasonable fact-finder could conclude that the officers' assurances were sufficiently directed towards the Chang family so as to justify their reliance.

### 2. Affirmative Acts

The Government next contends that, beyond the assurances themselves, there "is no evidence of any affirmative act undertaken by the Marine Corps for the benefit of the Plaintiffs" – a deficiency that purportedly precludes the formation of a special relationship under Maryland law. (ECF No. 66-1, at 39-40). This argument ignores this court's prior conclusion – reached after an extensive analysis of Maryland case law and other relevant authority – that a specific promise of protection, coupled with evidence of reliance, can be enough to establish a special relationship. (*See* ECF No. 16, at 42-52). In other words, Maryland law does not require actual performance before a special relationship is formed; the key is whether the promise is of the type that would ordinarily induce reliance on the promisor by the injured party. *See Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 256 (1999); Restatement (Third) of Torts § 42. Even when the evidence adduced during discovery is considered, a reasonable fact-finder who credits

Plaintiffs' version of events could conclude that the alleged assurances satisfy this standard.

### 3. Reliance

Finally, the Government again asserts that Plaintiffs have failed to establish the type of reliance that is required to form a special relationship under Maryland law. The Government's position is based on two related arguments: that there is no evidence of reliance-in-fact by Plaintiffs and that, in any event, any reliance would have been unreasonable.

As to the first argument, the Government maintains that Plaintiffs could not actually have relied on the officers' alleged assurances of November 4 because the record indicates that they acted exactly the same both before and after learning of the visit. (ECF No. 66-1, at 41-42). This argument rests on two faulty assumptions. First, it assumes that if Plaintiffs had truly feared for their safety following Sgt. Eugene's arrest on November 2, they immediately would have begun taking steps "above and beyond what they would normally do to provide for their own protection," such as installing an alarm system or hiring private security guards. Second, the Government's argument assumes that, immediately after learning of the officers' alleged assurances, Plaintiffs would have stopped pursuing such extraordinary measures by cancelling the alarm

system installation or firing the security guards – effectively creating a paper trail to confirm that Plaintiffs had ceded all control for their safety to the Marine Corps.

These assumptions are not warranted when the facts are viewed in the light most favorable to Plaintiffs. Angele testified that she believed that Sgt. Eugene had been confined to Henderson Hall over the weekend. (ECF No. 66-15, Angele Dep., at 72-73). Thus, upon learning of Captain Richards's and Gy. Sgt. Holden's assurances on November 4, Angele and her family had no need drastically to alter their behavior. Rather, the Chang family continued to go about their lives based on a belief that Sgt. Eugene would not be free to roam about off-base.

With respect to their second reliance argument, the Government contends that it would not have been reasonable for Plaintiffs to rely on the officers' alleged assurances once they learned that Sgt. Eugene was not actually being restricted to base or being escorted off-base. Here again, this argument is unavailing when the facts are construed in the light most favorable to Plaintiffs. DeLisia did admit that she suspected Sgt. Eugene may have been responsible for her slashed car tires on Tuesday, November 5 – an event that occurred off-base. She also testified, however, that when she called to inquire about

42

Sgt. Eugene's whereabouts, Gy. Sgt. Holden reassured her that Sgt. Eugene would be restricted thereafter. (ECF No. 66-14, DeLisia Dep., at 57-61). Likewise, when Nakeisha learned that Sgt. Eugene had been off-base on the evening of Friday, November 8, 2002, she told Angele that she had called Captain Richards, who admitted that Sgt. Eugene was free to leave on the weekends but would be restricted on the weekdays. (*See* ECF No. 66-16, Nakeisha Dep., at 84-86; ECF No. 66-15, Angele Dep., at 92). Although these incidents could be construed by a fact-finder as undermining the reasonableness of Plaintiffs' continued reliance, it cannot be said as a matter of law that their reliance was unjustified.[8]

Accordingly, for the reasons stated above and as discussed at length in the Memorandum Opinion of February 2, 2011 (ECF No. 16), the Government's arguments regarding the lack of a special relationship under Maryland law must be rejected.

_____

[8] The Government also implies that Nakeisha and Angele had both heard from other relatives that Sgt. Eugene was in New Orleans, Louisiana, between November 8 and November 11. Angele specifically testified, however, that she did not learn about Sgt. Eugene's trip to New Orleans under after the fatal shooting on November 12. (ECF No. 66-15, Angele Dep., at 102-03). Nakeisha's deposition testimony is somewhat ambiguous as to whether she learned about the New Orleans trip prior to November 12 or at some point thereafter. (*See* ECF No. 66-16, Nakeisha Dep., at 19-23). Thus, the New Orleans trip does not provide a basis for concluding that Plaintiffs' reliance was necessarily unreasonable.

**D. A Fact-Finder Must Decide Whether the Marine Corps'
Failure to Fulfill the Officers' Promises Proximately
Caused Plaintiffs' Injuries.**

The Government next contends that, regardless of whether
the Marine Corps owed any tort duty to Plaintiffs, the
Government cannot be held liable because Sgt. Eugene, and Sgt.
Eugene alone, was the proximate cause of Plaintiffs' injuries.
(ECF No. 66-1, at 42-46). Plaintiffs respond that the members
of the Chang family were "foreseeable plaintiffs" in the
"foreseeable zone of danger" that would result if the Marine
Corps did not, in fact, restrict and monitor Sgt. Eugene as
promised. (ECF No. 67, at 35-36). Based on the present record,
the issue of proximate causation must be decided by the fact-
finder.

"It is a basic principle that [n]egligence is not
actionable unless it is a proximate cause of the harm alleged."
*Pittway Corp. v. Collins*, 409 Md. 218, 243 (2009) (internal
quotation marks omitted) (alteration in original). "To be a
proximate cause for an injury, 'the negligence must be 1) a
cause in fact, and 2) a legally cognizable cause.'" *Id.*
(quoting *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335
Md. 135, 156-57 (1994)). "The first step in the
analysis . . . is an examination of causation-in-fact to
determine who or what caused an action. The second step is a

44

legal analysis to determine who should pay for the harmful consequences of such an action." *Id.*

Maryland courts generally view the first step as a "threshold inquiry of 'whether [the] defendant's conduct actually produced an injury.'" *Pittway*, 409 Md. at 243 (quoting *Peterson v. Underwood*, 258 Md. 218, 243 (2009)). When only the defendant's negligent act is at issue, causation-in-fact is satisfied if the "the injury would not have occurred absent or 'but for' the defendant's negligent act." *Id.* at 244. By contrast, when – as here – an injury is the result of two or more independent acts, causation-in-fact is satisfied if it is "'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Id.*

The second step in the proximate causation inquiry – *i.e.*, determining "whether the defendant's actions constitute a legally cognizable cause of the complainant's injuries" – is a test of foreseeability. *Pittway*, 409 Md. at 245–46. The court must "consider whether the actual legal harm to a litigant falls within a general field of danger that the actor should have anticipated or expected." *Id.* at 245. If the harm was a foreseeable result of the defendant's negligent conduct, then the requirement for legal causation is generally met. *Id.* at 246. By contrast, where the injury is remote from the negligent

conduct and the harm is out of proportion to the defendant's culpability, liability may be limited. *See id.* at 246–47.

Although the analysis of proximate causation — both cause-in-fact and legal cause — is typically reserved for the trier of fact, "it becomes a question of law in cases where reasoning minds cannot differ." *Segerman v. Jones,* 256 Md. 109, 135 (1969). In other words, proximate causation is a question of law only when "the facts of th[e] case are susceptible of but one inference." *Pittway*, 409 Md. at 253.

Here, the Government focuses exclusively on legal causation, arguing that Sgt. Eugene's conduct on November 12 constituted an intervening and superseding cause that broke any nexus between the Marine Corps' alleged negligence and the Plaintiffs' injuries. (ECF No. 66-1, at 42-46). The Government posits that Sgt. Eugene's atrocities were unforeseeable and "highly extraordinary" given that (1) the Marine Corps were not aware of any other incidents of violence; (2) there was no indication that Sgt. Eugene had ever threatened harm to anyone other than Nakeisha; (3) there was a substantial period of time between the first breach of the alleged promises on November 4 and when Sgt. Eugene acted on November 12; and (4) the Plaintiffs' injuries are out of proportion to any possible responsibility of the Marine Corps officers, whose actions are

"completely overshadowed by the culpability of Sgt. Eugene."
(*Id.* at 46).

Although it is clear that Sgt. Eugene's actions were an intervening act that served as one cause-in-fact of Plaintiffs' injuries, it cannot be said as a matter of law that his conduct was a superseding act. In Maryland, a defendant can still be liable when "'the intervening causes, acts, or conditions were set in motion by his earlier negligence, or naturally induced by such wrongful act.'" *Atl. Mut. Ins. Co. v. Kenney*, 323 Md. 116, 129 (quoting *Penn. Steel Co. v. Wilkinson*, 107 Md. 574, 581 (1908)). Put differently, "'if the situation wrongfully created by the defendant increased the risk of damage through the operation of another reasonably foreseeable force, the defendant is liable for the ensuing loss.'" *Manor Inn of Bethesda*, 335 Md. at 160 (quoting *Little v. Woodall*, 244 Md. 620, 626 (1966)).

Here, reasoning minds could differ both as to whether Sgt. Eugene was a reasonably foreseeable force and whether the Marine Corps' failure to fulfill the officers' alleged assurances to restrict and monitor Sgt. Eugene increased the risk of damage that he could inflict on Plaintiffs. In light of the severity of Nakeisha's injuries, Nakeisha's testimony that she communicated her fears for the safety of her family to the officers, and Captain Richards's testimony that he advised his

supervisors to take disciplinary action against Sgt. Eugene by restricting him to base, it would not be unreasonable for a fact-finder to conclude that Sgt. Eugene's intervening acts were foreseeable by the Marine Corps. Likewise, it is for a fact-finder to decide whether the harm suffered by Plaintiffs is out of proportion to any culpability of the officers.

### E. The Maryland Statute Governing the Timeliness of Wrongful Death Claims Does Not Bar Plaintiffs' Claims.

The Government alternatively contends that Plaintiffs' wrongful death claims are barred by the three-year "statute of repose" established by the Maryland statute governing wrongful death claims, Section 3-904(g) of the Maryland Code, Courts and Judicial Procedings Article. (ECF No. 66-1, at 47; ECF No. 68, at 22-23).[9] Because Kelvin and Aldwin Chang died on November 12,

---

[9] The Government did not raise this argument in its first motion to dismiss. (*See* ECF No. 10-1). In its answer, the Government asserted as an affirmative defense that "Plaintiff[s'] recovery is barred by the doctrines of contributory negligence, assumption of the risk, laches, statute of limitations, release, waiver, and/or last clear chance," but did not specifically mention the phrase "statute of repose" or cite to Md. Code Ann., Cts. & Jud. Proc. § 3-904(g). (ECF No. 18, at 5). It is concerning that the Government waited until this stage of the proceedings to raise its timeliness argument. Nonetheless, the argument will be considered as the prevailing rule is that a statute of repose is not an affirmative defense that needs to be pleaded in a defendant's answer to avoid waiver. *See, e.g.*, *Roskam Baking Co., Inc. v. Lanham Mach. Co.*, 288 F.3d 895, 902-04 (6th Cir. 2002); *Am. Fed'n of Teachers, AFL-CIO v. Bullock*, 605 F.Supp.2d 251, 261 (D.D.C. 2009).

48

2002, and because Plaintiffs did not file suit until March 30, 2010, the Government contends that their claims are barred as a matter of substantive state law, regardless of whether they complied with the FTCA's timing provisions. Plaintiffs respond that Section 3-904(g) is a procedural statute of limitations rather than a substantive statute of repose and is therefore preempted by the FTCA's timing provisions. (ECF No. 67, at 36-38). As explained below, Plaintiffs have the better argument.

The FTCA establishes that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . ." 28 U.S.C. § 2401(b). If the agency fails to issue a final decision within six months, the claimant may elect to construe the agency's inaction as a final denial and may bring suit in federal district court. *Id.* § 2675(a). The claimant is not, however, required to do so and may instead continue to pursue the administrative process until a final decision is rendered by the agency, at which point the claimant has six months to initiate a lawsuit in federal district court. *See id.;* 28 U.S.C. § 2401(b).

The Fourth Circuit recently addressed the interplay between the FTCA's timing provisions and state law statutes of limitations and repose. *See Anderson v. United States*, 669 F.3d

161, 164-65 (4th Cir. 2011) ("*Anderson I*"). The *Anderson I* court explained that, although substantive state law establishes the cause of action in an FTCA case, "'federal law defines the limitations period.'" *Id.* (quoting *Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991)). Nevertheless, state law may still "speak to the timeliness of a claim brought under the FTCA, because a state's enactment of a statute of repose creates a substantive right in those protected to be free from liability after a legislatively-determined period of time." *Id.* at 164-65 (internal quotation marks omitted). In other words, "[b]ecause statutes of repose are substantive limitations on liability, an FTCA claim does not lie against the United States where a statute of repose would bar the action if brought against a private person in state court." *Id.* (citing *Simmons v. United States*, 421 F.3d 1199, 1202 (11th Cir. 2005)).

In *Anderson I*, the plaintiff alleged that a hospital operated by the United States Veterans Administration ("the VA") had negligently failed to detect an epidural spinal tumor. *Anderson I*, 669 F.3d at 163. On December 17, 2003, approximately one year after her physicians discovered the tumor, the plaintiff filed an administrative claim with the VA. The plaintiff's claim proceeded through the administrative process for nearly four years, and the VA ultimately denied the

claim by letter dated September 26, 2007.  On January 2, 2008,
the plaintiff filed an FTCA suit in this court.  The Government
moved to dismiss, arguing that the plaintiff's suit was barred
by Section 5-109(a)(1) of the Maryland Code, Courts and Judicial
Proceedings Article, which provides that "[a]n action for
damages for an injury arising out of the rendering of or failure
to render professional services by a health care
provider . . . shall be filed within the earlier of:  (1) Five
years of the time the injury was committed; or (2) Three years
of the date the injury was discovered."  Judge Blake granted the
Government's motion, concluding that, because Maryland's highest
court had recently characterized Section 5-109(a)(1) as a
substantive statute of repose (rather than a procedural statute
of limitations) and because the plaintiff had not filed her
lawsuit until more than three years after discovering her
injury, her negligence claim was barred as a matter of
substantive state law.  *Id.* at 163-64.

On appeal, the *Anderson I* court held that the "key inquiry"
for analyzing a timeliness argument in an FTCA case is
determining whether the state law at issue "is a substantive
statute of repose or a procedural statute of limitations."
*Anderson I*, 669 F.3d at 165.  If the latter, "the FTCA's two-
year statute of limitations preempts the state statute," and a

51

plaintiff's claim survives so long as she presents it to the appropriate Federal agency within two years after accrual and files suit within six months of the agency's denial. *Id.* By contrast, the *Anderson I* court observed that, if the state statute is one of repose, a plaintiff's claim "*may* be barred, because allowing it to proceed would potentially impose liability on the [G]overnment in a different manner and to a greater extent than on a private individual under like circumstances." *Id.* at 165 & n.2 (emphasis added) (acknowledging but not addressing the plaintiff's alternative argument that "the mandatory administrative procedures required by the FTCA tolls the running of the statutory period prescribed by Section 5-109 until the administrative process is exhausted").[10]

---

[10] By leaving this question open, the opinion in *Anderson I* is internally inconsistent. Early in the opinion, the court appeared to adopt a definitive rule that "[b]ecause statutes of repose are substantive limitations on liability, an FTCA claim does not lie against the United States where a statute of repose would bar the action if brought against a private person in state court." *Anderson I*, 669 F.3d at 165. Yet in the next paragraph, the court stated that if Section 5-109(a)(1) is a statute of repose, the plaintiff's claims "*may* be barred" – leaving open the possibility that a plaintiff who complies with the FTCA's timing provisions may still be able to rely on tolling principles or preemption to save a lawsuit that would be otherwise be barred by a statute of repose.

The Fourth Circuit certified the question of whether Section 5-109(a)(1) is a statute of limitations or a statute of repose to the Court of Appeals of Maryland. In a lengthy opinion, the Court of Appeals discussed the legislative history of Section 5-109(a)(1) as well as the historical differences between statutes of repose and statutes of limitations. *Anderson v. United States*, 427 Md. 99, 108-22 (2012) ("*Anderson II*") (observing that "there are overlapping features of statutes of limitations and statutes of repose" and that there is "no hard and fast rule to use as a guide"). The Court of Appeals explained that statutes of limitations are "enacted typically to encourage prompt resolution of claims, to suppress stale claims, and to avoid the problems associated with extended delays in bringing a cause of action," whereas the purpose of a statute of repose "is to provide an absolute bar to an action or to provide a grant of immunity to a class of potential defendants after a designated time period." *Id.* at 118. Ultimately, the *Anderson II* court held that – notwithstanding prior references to the statute as "an absolute bar" to suit – Section 5-109(a)(1) is properly classified as a statute of limitations for two primary reasons: (1) because its three-year time period is "triggered by the cause of action itself — the injury" (*i.e.*, a negligent act coupled with some harm) "rather than being dependent on some

53

action independent of the injury"; and (2) because the Maryland Legislature expressly made the provision subject to tolling in cases of fraudulent concealment and minority. *Id.* at 122-27.

Based on the state court's answer to the certified question, the Fourth Circuit held that Section 5-109(a)(1) was "inapplicable" to the plaintiff's claim, which was instead governed by the FTCA's timing provisions. *Anderson v. United States*, 474 F.App'x 891, 892 (4th Cir. 2012) (unpublished *per curiam* decision) ("*Anderson III*"). Thus, the *Anderson III* court reversed the district court's order of dismissal and remanded the case without deciding whether a plaintiff's compliance with the FTCA's administrative exhaustion requirements could save a claim that would typically be barred by a substantive statute of repose.

Pursuant to the *Anderson* line of cases, the key inquiry here is whether Section 3-904(g) is a statute of limitations or a statute of repose. *See Anderson I*, 669 F.3d at 165. Section 3-904(g) provides as follows:

> (1) Except as provided in paragraph (2) or (3) of this subsection, an action under this subtitle shall be filed within three years after the death of the injured person.
>
> (2) . . .
>
> (ii) If an occupational disease was a

cause of a person's death, an
action shall be filed:

1. Within 10 years of the time of
death; or

2. Within 3 years of the date when
the cause of death was
discovered, whichever is shorter.

(3) . . .

(ii) If knowledge of a cause of action
or the identity of a person whose
wrongful act contributed to a
homicide is kept from a party by
the conduct of an adverse party or
an accessory or accomplice of an
adverse party:

1. The cause of action shall be
deemed to accrue at the time the
party discovered or should have
discovered by the exercise of
ordinary diligence the homicide
and the identity of the person
who contributed to the homicide;

. . .

3. An action under this subtitle
shall be filed within 3 years
after the date that the cause of
action accrues.

Md. Code Ann., Cts. & Jud. Proc. § 3-904(g). As the Government

observes, the Court of Appeals of Maryland has repeatedly

construed Section 3-904(g) "to be a substantive provision, that

is, a condition precedent to asserting the statutorily created

cause of action" for wrongful death. *Univ. of Md. Med. Sys.*

*Corp. v. Muti*, 426 Md. 358, 370 (2012). Thus, "[a] plaintiff who does not assert the cause of action within the statutorily prescribed time, now three years, loses the right to sue a defendant who is not estopped to assert the defense." *Id.; see also Ga.-Pac. Corp. v. Benjamin*, 394 Md. 59, 82 (2006) ("Historically, we have construed the limitation period prescribed in § 3-904(g) as a condition precedent to maintaining a cause of action, rather than as a statute of limitations."); *Waddell v. Kirkpatrick*, 331 Md. 52, 60 (1993) (because Section 3-904(g) "is a condition precedent, as opposed to a statute of limitations," there is no basis for tolling its three-year period based on minority); *Knauer v. Johns-Manville Corp.*, 638 F.Supp. 1369, 1375 (D.Md. 1986) ("Failure to bring suit within the statutory three-year period bars both the remedy and the right to sue.").

Despite the consistent use of seemingly absolute language, it is not (as the Government suggests) a foregone conclusion that the Court of Appeals of Maryland considers Section 3-904(g) to be a statute of repose. Pursuant to the criteria outlined in *Anderson II*, Section 3-904(g) does not have any of the hallmarks of a statute of repose. Most notably, the Maryland Legislature has created explicit tolling exceptions to the three-year period in cases of occupational disease and homicide. The Court of

Appeals of Maryland has also applied other legislatively enacted tolling provisions to the general three-year period established by Section 3-904(g) in cases of fraud and fraudulent concealment. *See Geisz v. Greater Balt. Med. Ctr.*, 313 Md. 301, 322-24 (1988) (concluding that, "although the time period specified in the wrongful death statute is not an ordinary statute of limitations but is part of the substantive right of action . . . estoppel based on fraud or fraudulent concealment of the cause of action operates to toll the substantive limitations period"). In addition, the three-year period is triggered by accrual of the cause of action itself (*i.e.*, the death of the injured person), rather than being dependent on some conduct or action that is independent of the injury.

In sum, Section 3-904(g) is not properly characterized as a statute of repose based on the criteria outlined in *Anderson II.* Although Maryland appellate courts may nonetheless view the provision as a "substantive condition precedent" to suit, the Fourth Circuit's opinion in *Anderson I* implies that statutes of repose are the only type of state law that can possibly "speak to the timeliness of a claim brought under the FTCA." *Anderson I*, 669 F.3d at 165. Accordingly, there is no basis for applying

Section 3-904(g) here.  Rather, the relevant timing provisions

are those established in the FTCA.[11]

_____

[11] Even if Section 3-904(g) did qualify as a substantive
statute of repose, the Government's argument would still likely
fail.  As discussed, in *Anderson I*, the Fourth Circuit appeared
to adopt a bright-line rule that a claim against the United
States will not lie when it would be barred by a state statute
of repose.  Ultimately, however, the *Anderson I* court declined
to address what should happen when a plaintiff files an
administrative claim within the period demanded both by the FTCA
and by a state's statute of repose, but then – after waiting
years for the administrative exhaustion process to run its
course – ultimately files her lawsuit in federal district court
within six months of the agency's denial as required by the FTCA
but beyond the period prescribed by substantive state law.
Other courts to address the issue have held that, in such
circumstances, the FTCA's timing provisions preempt the statute
of repose, notwithstanding the substantive nature of the
statute.  *See, e.g.*, *Jones v. United States*, 789 F.Supp.2d 883,
892 (M.D.Tenn. 2011) (given the intent of the exhaustion scheme
established by the FTCA, "[a] claimant's claim is extinguished
only if the claimant fails to meet the deadlines in § 2401(b),
and a state's statute of repose has no effect on the federal
claim"); *Zander v. United States*, 786 F.Supp.2d 880, 885 (D.Md.
2011) (although the plaintiff could have complied with the
applicable statute of repose by filing suit after six months
passed without an agency decision, waiting for a final agency
denial did not extinguish her claim because the FTCA's statute
of limitations preempts the Maryland statute of repose, despite
its "substantive" nature); *Mamea v. United States*, No. 08-00563,
2011 WL 4371712, at *9-12 (D.Haw. Sept. 16, 2011) (regardless of
whether a six-year period established by a Hawaii statute was a
statute of repose or otherwise "a part of the substantive law of
the place," it was preempted by the FTCA's timing provisions);
*Kennedy v. U.S. Veterans Admin.*, No. 12-3049, 2013 WL 1693965,
at *7-8 (6th Cir. Apr. 19, 2013) (unpublished) (White, J.,
concurring in the judgment) (because "Section 2401(b) was
enacted to provide a more efficient and effective process for
resolving tort actions against the federal government" and
because "Congress clearly intended that a claimant who files a
timely claim with the agency will have properly invoked the

**F.      The Wrongful Death Claims Asserted by Isla, DeLisia, and Vinele Are Not Subject to Dismissal.**

The Government's final two arguments relate to the FTCA's presentment requirement.  First, the Government contends that Plaintiff Isla Washington's claim must be dismissed because she failed to file an administrative claim seeking damages for her son Kelvin's death.  Second, the Government asserts that Vinele's and DeLisia's claims must be dismissed because they were not joined as Plaintiffs to this lawsuit until more than six months had passed from the date when the Agency issued a final denial of their claims.  (ECF No. 66-1, at 48-50; ECF No. 68, at 23-25).  Plaintiffs respond that (1) the FTCA's presentment requirement was satisfied here, including with respect to Isla, as the Government has long been on notice that it would face a wrongful death claim by Kelvin's beneficiaries; and (2) the Government will not face any prejudice if the amended complaint adding Vinele and DeLisia as Plaintiffs is deemed to relate back to the original, timely filed complaint.  (ECF No. 67, at 38-41).  As set forth below, Plaintiffs' arguments are persuasive.

---

administrative process and is entitled to file suit within six months of the agency decision," it would be improper to "allow agencies to delay notices of denial in order to allow the statute of repose to extinguish a plaintiff's claim").  This reasoning is persuasive.

Generally, a plaintiff may not maintain a negligence action against the United States "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally decided by the agency in writing." 28 U.S.C. § 2675. The filing of an administrative claim is a jurisdictional prerequisite and may not be waived. *Henderson v. United States*, 785 F.2d 121, 123 (4th Cir. 1986). A claim is "presented" if it provides the Government with adequate notice to conduct a proper investigation into the underlying incident and places a "sum certain" on the claim's value. *Mack v. United States*, No. JFM-00-2296, 2001 WL 179888, at *4 (D.Md. 2001) (citing *Ahmed v. United States*, 30 F.3d 514, 516–17 (4th Cir. 1994)).

Generally, "if there are multiple claimants in the matter, each claimant must individually satisfy the jurisdictional prerequisite of filing a proper claim, unless another is legally entitled to assert such a claim on their behalf." *Muth v. United States*, 1 F.3d 246, 249 (4th Cir. 1993) (internal quotation marks omitted). Nonetheless, because the FTCA "was not intended as a trap for the unwary claimant," courts in this district have "allowed claims to go forward when all of the plaintiffs have not filed separate claims and the claims arose out of the same facts and were for the same amount of money."

*Starr v. United States*, 262 F.Supp.2d 605, 607 (D.Md. 2003) (internal quotation marks omitted) (where an SF-95 form listed only the name of the victim and did not specifically list the victim's parents, the parents were nonetheless permitted to pursue a wrongful death action against the Government because the SF-95 form did list "$2,000,000" in the space reserved for "wrongful death" – a recovery that could only inure to the benefit of the victim's parents); *Munger v. United States*, 116 F.Supp. 2d 672, 676 (D.Md. 2000) (although the SF-95 form mentioned only a survival action brought by the administrator of the victim's estate, the victim's parents could still pursue a wrongful death claim against the Government because, although "wrongful death actions and survival actions . . . are distinct claims in Maryland, they come from the same set of facts"). So long as the Government "has had a full and fair opportunity to investigate the claim which has been asserted and to decide whether to settle that claim," there is no prejudice in allowing new claims that arise out of "precisely the same facts." *Nicholson Air Serv. Inc. v. United States*, 686 F.Supp. 538, 538-39 (D.Md. 1988).

Here, although it is undisputed that Isla Washington never filed an administrative claim, it is clear that the SF-95 form filed by Angele, Vinele, and DeLisia placed the Government on

notice that they planned to pursue a wrongful death claim related to Kelvin's death. The Maryland Wrongful Death Act specifically provides that a wrongful death action "shall be for the benefit of the wife, husband, *parent*, and child of the deceased person." Md. Code Ann., Cts. & Jud. Proc. § 3-904(a)(1) (emphasis added). By its plain terms, this statutory language should have provided notice to the Government that Kelvin's surviving parents would be joined in any eventual lawsuit.

For similar reasons, the Government's arguments that Vinele's and DeLisia's claims are barred by the FTCA's timing provisions must be rejected. As noted, the FTCA requires that all actions be brought "within six months after the date of mailing . . . of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b). The Navy mailed its denial letter on September 29, 2009, and Plaintiffs did not file an amended complaint adding Vinele and DeLisia until February 22, 2011. (ECF No. 19). The FTCA's six-month filing requirement does not pose a bar to their claims, however, by virtue of the relation back rules set forth in Fed.R.Civ.P. 15(c). As explained in the Memorandum Opinion of February 2, 2011:

Where . . . defendants have been fully

apprised of a claim arising out of specified conduct alleged in the original complaint and thereby have notice of that claim, and where defendants have not demonstrated that they would be prejudiced by the adding of new plaintiffs, the claims of the new plaintiffs asserted in an amended complaint involving the same conduct alleged in the original complaint 'relate back' to the filing date of the original complaint for limitations purposes." *Arrington v. Colleen, Inc.*, No. AMD 00-191, 2000 WL 34001056, at *8 (D.Md. Aug. 7, 2000) (Davis, J.); see also Fed.R.Civ.P. 15(c). This permissive approach serves the underlying purposes of the Federal Rules. In the Fourth Circuit, "is well-settled that Rule 15 is chiefly concerned with ensuring (i) that there is a factual nexus between the amendments and the prior pleading, and (ii) that a defendant had sufficient notice of these new claims such that he will not suffer prejudice if the amendments are found to relate back." *Vitullo v. Mancini*, 684 F.Supp.2d 747, 754 (E.D.Va. 2010).

The amendment of the complaint to add Vinele and DeLisia would present facts on all fours with the facts already alleged, as their addition does not change the operative facts of this case in any way. Their addition to the case can only be expected to affect the calculation and distribution of any damages resulting from the wrongful death action.

As for prejudice, there is not any indication or suggestion from the Government that it would suffer prejudice from the addition of these two parties. Moreover, the Government has long been on notice of the existence of their claims. Not only did Vinele and DeLisia participate in the underlying administrative claim, but the complaint and its attached materials make it clear that the daughters' interests are at

stake. Finally, the Maryland Wrongful Death
Act itself should have provided notice that
the daughters would be plaintiffs because of
its requirement that all beneficiaries be
involved. *See, e.g.*, *Williams v. United
States*, 405 F.2d 234, 238-39 (5th Cir. 1968)
("[I]t is plain that the government had fair
notice. First, the occurrence as an
operational set of facts was stated fully. .
. . Next, the complaint, read with required
liberality . . . clearly revealed the
existence of (a) a m[i]nor (b) the mother as
parent and (c) the assertion by her of a
claim. Since liability to the minor would
give rise to a liability to the parent under
local law, and since the circumstances of
these individuals was such as would
reasonably indicate a likelihood that the
parent would incur losses of a recoverable
kind, the Government was put on notice that
the parent's claim was also involved.").

(ECF No. 16, at 60-61).

Nothing in the Government's motion changes this analysis.
The Government asserts that "it is axiomatic that a federal
procedural rule (Rule 15) cannot relax a jurisdictional bar
(§ 2401(b))." (ECF No. 66-1, at 50). Yet courts presented with
analogous facts have relied on Rule 15(c) to do just that. *See,
e.g.*, *Goodman v. United States*, 298 F.3d 1048, 1054 (9th Cir.
2002) (where the original, timely filed complaint mistakenly
named the claimant in his capacity as administrator for the
decedent's estate, the later-filed amended complaint
substituting the claimant in his individual capacity related
back to the original complaint, "thus satisfying the

jurisdictional requirements of Section 2401(b)"). Accordingly, the Government's alternative arguments for partial summary judgment also fail.

## IV. Conclusion

For the foregoing reasons, the Government's motion for summary judgment will be denied. A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
